LOUIS J. LEFKOWITZ, as Attorney-General of the State of New York, Respondent, v. CORNELL UNIVERSITY et al., Appellants.

Fourth Department, November 5, 1970.

*Phillips, Lytle, Hitchcock, Blaine & Huber* (*Alexander C. Cordes* of counsel), and *Sullivan & Cromwell* for Cornell University and another, appellants.

*Raichle, Banning, Weiss & Halpern* (*Frank G. Raichle* of counsel), for EDP Technology, Inc., appellant.

*Bond, Schoeneck & King* (*John A. Beach* of counsel), for Syracuse University, *amicus curiae.*

*Louis J. Lefkowitz, Attorney-General* (*Warren Goidel* of counsel), respondent.

MARSH, J. Defendants, Cornell University (Cornell), Cornell Aeronautical Laboratory, Inc. (CAL) and EDP Technology, Inc. (EDP) appeal from a judgment whereby it was ordered and adjudged that all of the defendants be permanently enjoined from consummating the proposed sale of CAL to EDP; and that defendants Cornell and CAL be permanently enjoined from conveying CAL or any of its capital stock or its land, buildings, or facilities, except upon notice to the Attorney-General and approval by the Supreme Court.

In late 1945, Curtiss-Wright Corporation was the owner of research laboratory facilities, together with an uncompleted wind tunnel, located in the Town of Cheektowaga, Erie County. Due to the conclusion of World War II and also because of a planned move by Curtiss-Wright to Columbus, Ohio, Curtiss-Wright felt there was little prospect of its using the wind tunnel to the extent originally contemplated. It therefore considered making a charitable gift of the Cheektowaga facilities in order to obtain a tax saving for the year 1945, a year in which it could derive the maximum benefit from a tax deduction.

After the facilities had been offered to and rejected by at least one other university, Curtiss-Wright began preliminary negotiations with Cornell concerning the disposition of the lab. Thereafter, on December 13, 1945, Curtiss-Wright presented a formal proposal to Cornell. By the terms of the proposal, Curtiss-Wright was to:

(1) donate to Cornell the wind tunnel and research facilities located at Cheektowaga;

(2) donate the sum required to complete the wind tunnel;

(3) make available for employment by Cornell, insofar as possible, such members of the laboratory and wind tunnel staff as Cornell might designate.

In return, Cornell was to:

(1) conduct such further research and development upon certain of Curtiss-Wright's inventions as were then in existence as Curtiss-Wright might request and at reasonable charge;

(2) continue research and development work then being performed at the facility by Curtiss-Wright for others; and

(3) enter into separate agreements with Curtiss-Wright for the performance of such additional research and development work as Curtiss-Wright might require subsequent to the transfer of the facilities, it being understood that Curtiss-Wright would receive terms at least as favorable as those granted to anyone else.

An underlying condition of the entire proposal was that the gift be consummated for tax purposes before January 1, 1946.

Cornell accepted the proposal and the facilities were transferred to it by deed and bill of sale. Both the deed and bill of sale recite that the transfer was made in consideration of $1 '' and the advancement of science and education.''

In addition to the property received from Curtiss-Wright, Cornell also received cash gifts totaling $675,000 from several eastern aircraft manufacturers, the money to be utilized to provide working capital for the laboratory. This money had been solicited by Cornell prior to its acceptance of the laboratory and wind tunnel facilities in order to insure that the laboratory would not become a financial drain on the university.

The laboratory was leased by Cornell to Cornell Research Foundation, Inc. and was operated as a division of the Foundation from January 1, 1946 until May 31, 1948. On March 4, 1948, CAL was incorporated and soon thereafter, on June 1, 1948, it acquired the laboratory and wind tunnel facilities in exchange for the issuance of its 100 shares of stock to Cornell. All of the stock issued by CAL has been continuously owned and held by Cornell and the ultimate control of the operation of the laboratory was and is in Cornell.

During the more than 20 years of its ownership of the lab, Cornell has maintained a policy of operating it on a nonprofit basis. With the exception of a total sum of $1,698,882 which was used for such purposes as fellowships, professorships and CAL's share of administrative expenses, all of the profits have been plowed back into the laboratory. As a result of this policy CAL has grown considerably over the years. At the time the facilities were acquired from Curtiss-Wright, they had a value of approximately $5,000,000. CAL's present value is approximately $25,000,000 to $30,000,000. In 1969 it had a gross income of over $30,000,000 and a net profit of over $1,400,000.

In addition, CAL has expanded its research operations so that in addition to aeronautical research, which at one time was almost its sole preoccupation, it now conducts research into such fields as air and water pollution, automobile safety, urban transportation problems and fingerprint identification.

Apparently as a result of pressure from certain student and faculty groups a committee was appointed to study Cornell-CAL relationships. The committee found that student utilization of CAL has been small and that potential conflict exists between CAL's overseas research efforts and Cornell's large and expanding program of international studies. It, therefore, concluded that CAL should be separated from Cornell.

After receiving offers from five prospective purchasers of CAL, the executive committee of the board of trustees, on Sep-

tember 17, 1968, voted to accept EDP's offer of $25,000,000 and entered into a formal contract of sale approximately one year later.

After becoming aware of the proposed sale of CAL to EDP, the Attorney-General, by a complaint dated November 8, 1968 commenced this action pursuant to article 8 of EPTL. As the statutory representative of beneficiaries of charitable trusts, the Attorney-General seeks: (1) a permanent injunction against the proposed sale of CAL to EDP; (2) a permanent injunction against the sale of CAL to any person except a nonprofit organization, and then, only upon notice to the Attorney-General and approval by the court; and (3) a direction that Cornell use the proceeds of any sale for similar educational, research and scientific purposes in the field of aeronautics and allied fields.

The Attorney-General seeks to block the sale of CAL on two grounds:

(1) that the laboratory and wind tunnel facilities were given to Cornell " for a charitable use in the nature of a public trust for educational, research and scientific purposes " and

(2) that even if the facilities were not originally given in the nature of a trust, Cornell, by its actions and statements over the years concerning CAL, has itself dedicated and rededicated the facilities as a public trust for scientific and educational purposes.

The basis for the latter assertion is that Cornell and CAL have made many statements over the years that CAL would be operated as a nonprofit institution and would continue to be an instrument of service to the aircraft industry, to education and to the public at large. These statements, most of them made by CAL rather than Cornell, were made at dedication ceremonies, in applications by CAL for tax exemptions, in policy statements of CAL, in minutes of CAL board of director meetings and in publications distributed by CAL for purposes of recruiting personnel and obtaining research contracts.

The court below, after stating that the formal documents transferring the facilities did not express the entire agreement of the parties, examined the facts and circumstances surrounding the gift and held (62 Misc 2d 95, 100) that: " From the evidence relating to the circumstances surrounding the gift of the laboratory from Curtiss-Wright to Cornell and the clear understanding of the parties, it appears that a ' charitable trust ' was created for the restricted purpose of conducting a laboratory to conduct scientific research and not for the purpose of supporting the general educational programs of Cornell " and

further that: '' Although it is not necessary for a determination of this action, it is the opinion of the court that Cornell by its actions and the use of the laboratory for research purposes over the years and the use of the income almost entirely for research purposes as the laboratory itself created a charitable trust or use for that purpose, which now prevents the diversion of the laboratory or the income therefrom to an entirely different purpose.'' The court also stated that there was no showing that the sale of CAL would in any way promote the carrying out of the purposes of the charitable trusts.

New York courts have held that where a gift is made to a charitable corporation subject to the restriction that it be used for a specific purpose which is one of its corporate purposes, no trust is created in the technical sense. (*St. Joseph's Hosp.* v. *Bennett,* 281 N. Y. 115; 7 N. Y. Jur., Charities, § 62.) However, the cases have held that a trust will be implied in the sense that the gift will be required to be devoted to the purposes for which it was given. (*St. Joseph's Hosp.* v. *Bennett, supra;* *Sherman* v. *Richmond Hose Co.,* 230 N. Y. 462; 7 N. Y. Jur., Charities, §§ 62, 79.) The laboratory was given to Cornell for the '' advancement of science and education.'' The '' advancement of science and education '' being one of Cornell's corporate purposes (L. 1865, ch. 585, § 1, as amd. by Education Law, §§ 5701–5702), the issue is not whether a charitable trust was created in the technical sense, but whether the gift of the laboratory was made subject to a restriction that it be forever used as a research laboratory.

In order to find that a restriction has been placed upon the use of a gift to a charitable corporation, such restriction must be clearly expressed. (*St. Joseph's Hosp.* v. *Bennett, supra;* Restatement, Trusts 2d, § 351.) In the instant case there is no clear expression of intent that the gift to Cornell was subject to the restriction that it be forever used as a research laboratory for the public benefit. In fact, an examination of the deed, bill of sale and the list of proposals submitted to Cornell by Curtiss-Wright leads one to the opposite conclusion.

By letter dated December 13, 1945, Curtiss-Wright submitted a list of proposals to Cornell in respect of the contemplated gift. An underlying condition of the entire proposal was that the gift be consummated prior to January 1, 1946. By the proposals which were submitted to and accepted by Cornell, Cornell was obligated to operate the laboratory only until the completion of work upon inventions of Curtiss-Wright which were then in existence and completion of work then being performed by

Curtiss-Wright pursuant to contracts with others. In view of the precision with which Curtiss-Wright spelled out the conditions of the gift, it seems clear that if Curtiss-Wright had intended to restrict Cornell's use of the laboratory to the extent that Cornell would be forever obligated to operate it as a research laboratory for the public benefit, it would have done so in the same clear and precise language. Thus, the implication is that no such restriction was ever intended.

The language used in the deed further supports this conclusion. In addition to reciting that the consideration of the conveyance was $1 and the " advancement of science and education ", the deed further recites that Curtiss-Wright " does hereby remise, release and quitclaim to (Cornell), its *successors* and *assigns* forever." (Emphasis added.) The habendum clause on page 3 of the deed also recites " TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, its successors and assigns forever ". In addition, the bill of sale also uses the words " successors and assigns ". It would appear that the use of these words is inconsistent with an intent that Cornell be forever obligated to operate the lab in trust for the public benefit. Additionally, there is no evidence that Cornell received the gift of the laboratory as a result of representations on its part that it would forever operate it for the public benefit.

Accordingly, we find that Cornell received the laboratory facilities free from a restriction that it forever operate it as a public trust.

Also the fact that Cornell solicited and received contributions from several aircraft manufacturers does not alter this result. While these cash gifts were made for the express purpose that they be used as operating capital for the laboratory, it is undisputed that that money was used for the purpose for which it was given and has long since been exhausted. In none of the letters from the aircraft companies is it stated that the gifts were conditioned upon Cornell's perpetual operation of the laboratory. Thus, while Cornell may have been obligated to operate the laboratory for some period of time during which the reasonably anticipated objectives of the donating airline companies might be fulfilled, it has fulfilled its obligations by continuously operating the lab for almost 25 years.

We also find that no trust was created by Cornell's conduct and actions with respect to the laboratory. While a charitable trust may be created by a declaration of the owner of the property that he holds it upon a charitable trust (Restatement,

Trusts 2d, § 349), no trust is created unless the donor manifests an intent to impose enforceable duties. (Restatement, Trusts 2d, § 351.) While no particular words are required to create the trust, "the words and acts relied upon must be unequivocal in nature and admit of no other interpretation than that the property is held in trust". (*Matter of Fontanella*, 33 A D 2d 29, 30.) The evidence in the instant case is insufficient to show that Cornell ever intended to create a trust. Apparently, the court below based its holding mainly upon the fact that over the years Cornell both used the laboratory for research purposes and continually "plowed back" almost all of the profits into the laboratory. While these actions reflect Cornell's policy with respect to the operation of the laboratory, they do not show that Cornell took steps to impose upon itself the legal obligation to continue such policies. In short, these actions do not show "beyond reasonable doubt that a trust was intended" to be created by Cornell (*Matter of Fontanella, supra*, pp. 30–31.)

It would further appear that such statements as were made at dedication ceremonies to the effect that CAL was a nonprofit institution operated as an instrument of service to the aircraft industry, education and the public at large did not manifest an intent to create a trust of the property but were merely expressions of Cornell's then present and contemplated future policies with respect to the operation of the laboratory.

It is clear that Cornell did not operate the laboratory as a separate corporation for purposes of establishing a trust. Rather, the decision to separate it from the university was the result of many factors, including limitation of financial risk on the part of the university and the nature of the contracts that the laboratory entered into. Cornell never passed any formal resolutions restricting the use of the income of the laboratory to research purposes.

Accordingly, we conclude that Cornell does not hold the laboratory facilities as a public trust but may sell them subject only to the restriction that it use the proceeds of the sale for the "advancement of science and education."

In accordance with the foregoing, the judgment should be reversed and the complaint dismissed.

GOLDMAN, P. J., WITMER, MOULE and HENRY, JJ., concur.

Judgment unanimously reversed on the law and facts, with costs, and complaint dismissed.