**UNITED STATES of America, Appellee,**

v.

**SUN MYUNG MOON and Takeru Kamiyama, Defendants-Appellants.**

**Nos. 755, 765, 766 and 1153, Dockets 82–1275, 82–1279, 82–1277, 82–1357 and 82–1387.**

United States Court of Appeals, Second Circuit.

Argued March 23, 1983.

Decided Sept. 13, 1983.

See also, 93 F.R.D. 558; 532 F.Supp. 1360; 688 F.2d 817; 697 F.2d 301.

Laurence H. Tribe, Cambridge, Mass. (Jeanne Baker, David J. Fine, Baker & Fine, Cambridge, Mass., Charles A. Stillman, Stillman, Friedman & Shaw, P.C., New York City, Bernard S. Bailor, Caplin & Drysdale, Chartered, Washington, D.C., of counsel), for defendant-appellant Moon.

Andrew M. Lawler, New York City (Maurice M. McDermott, Dennis E. Milton, Anne T. Vitale, Andrew M. Lawler, P.C., New York City, Barry A. Fisher, Robert C. Moest, David Grosz, Fisher & Moest, Los Angeles, Cal., of counsel), for defendant-appellant Kamiyama.

Jo Ann Harris, Asst. U.S. Atty., New York City (William M. Tendy, Acting U.S. Atty. S.D.N.Y., Gary G. Grindler, Gerard E. Lynch, Walter P. Loughlin, Asst. U.S. Attys., New York City, Martin Flumenbaum, Sp. Asst. U.S. Atty., New York City, of counsel), for appellee.

Samuel E. Ericson, Springfield, Va. (Edward Larson, Springfield, Va., of counsel), for the Center for Law and Religious Freedom, amicus curiae.

Steven R. Shapiro, New York City, for the American Civil Liberties Union and New York Civil Liberties Union, amicus curiae.

Earl W. Trent, Jr., Valley Forge, Pa., for National Ministries, American Baptist Churches in the U.S.A., amicus curiae.

Before OAKES, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

Reverend Sun Myung Moon and Takeru Kamiyama appeal from judgments of conviction entered on July 16, 1982 in the United States District Court for the Southern District of New York following a six-week jury trial before Judge Gerard L. Goettel. Moon was charged basically with filing false income tax returns and Kamiyama with obstructing the investigation of those returns.

Paying income taxes is not America's most popular national pastime. But, most accept the certainty of taxes as part of the price of modern life. Tax fraud prosecutions usually do not present the myriad of constitutional problems involved here. Yet in this case the defense raises troubling issues of religious persecution and abridgment of free speech that are interwoven with other grounds for objection to the judgments below. In reducing this huge record and the veritable avalanche of arguments presented to what we hope is comprehensible form, we have divided this opinion into five major sections—Denial of Bench Trial, Sufficiency of the Evidence, Jury Instructions, Miscellaneous Issues, and Kamiyama's Claims. Most of the issues raised have been addressed. Those not discussed are minor points that we consider wholly without merit.

We commend the manner in which Judge Goettel presided in this especially lengthy trial. Such errors as inevitably crept in were skillfully unearthed by counsel. Of course, defendants are only entitled to "a fair trial but not a perfect one." *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953). Defendants did receive a fair trial and we affirm their convictions on all counts, except Kamiyama's conviction on Count Seven which is reversed.

## BACKGROUND

The main indictment upon which Reverend Moon and Mr. Kamiyama were tried charged them in Count One with conspiracy, 18 U.S.C. § 371, to file false federal income tax returns, 26 U.S.C. § 7206(1), to obstruct justice, 18 U.S.C. § 1503, and to make false statements to government agencies, 18 U.S.C. § 1001, and to a federal grand jury, 18 U.S.C. § 1623. Counts Two, Three and Four charged Moon with filing false tax returns for 1973, 1974 and 1975, in violation of 26 U.S.C. § 7206(1). Counts Five and Six charged Kamiyama with aiding and abetting the filing of the false 1974 and 1975 returns, 26 U.S.C. § 7206(2). The remaining counts (Seven through Thirteen)

charged Kamiyama with the substantive offenses of obstruction of justice through the submission of false documents to the grand jury, 18 U.S.C. § 1503, submitting false documents to the Department of Justice, 18 U.S.C. § 1001, and five counts of perjury, 18 U.S.C. § 1623. A separate indictment charged Kamiyama with an additional count of perjury.

At the conclusion of the trial on May 18, 1982 the jury returned guilty verdicts against both defendants on all counts. Moon was sentenced to concurrent terms of 18 months in prison on Counts One through Four and fined $25,000 plus costs. Kamiyama was sentenced to concurrent terms of six months in prison on all counts of which he was convicted and fined $5,000. Both sentences have been stayed pending this appeal.

Defendants moved in September 1982 for a new trial, alleging juror misconduct. After holding hearings on this issue, Judge Goettel denied the motion by order dated October 13, 1982 and issued an order on November 5, 1982 restraining all parties and their agents from communicating with the trial jurors without prior consent of the court. Defendants appeal from these two post-trial orders as well as from their convictions.

The case focused principally on bank accounts held in Reverend Moon's name in the Park Avenue office of the Chase Manhattan Bank. On March 27, 1973 Reverend Moon walked into the Chase branch and opened a personal checking account and a savings account. During the next nearly three years over 1.7 million dollars was deposited in these accounts in Moon's name, all but $200,000 of which was in cash. A substantial portion of the funds were transferred to high-yielding Chase time deposits held in Moon's name. During the years 1973–1975 these investments earned more than $100,000 in interest, not reported as income on Moon's tax returns for the years in question. Also at issue was $50,000 worth of stock issued to Moon in 1973 in Tong Il Enterprises, Inc., a corporation organized in New York in 1973 by Moon and

Kamiyama which was engaged in the business of importing products from Korea. The receipt of this stock, which the government apparently views as a dividend, also was not reflected as income on Moon's tax return.

The critical issue is whether, as the government claims, Moon owned these assets and was therefore required to pay income taxes on the bank interest and the value of the stock or, as the defense urges, Moon held these assets merely beneficially or as a trustee for the Unification Church. Before entering upon a discussion of this central issue, we first address contentions raised by the defendants as a result of the government's refusal to consent to defendants' request for a bench trial.

## I

### DENIAL OF BENCH TRIAL

*A. As a Denial of the First Amendment Right to Free Speech*

It is the view of the defense that the government's reason for opposing the defendants' request for a bench trial is unconstitutional, so that the judge's acceptance of it was error of constitutional dimension mandating reversal. The factual background may be simply stated. At a rally in New York City's Foley Square on October 22, 1981 following his arraignment, Moon made a speech which was partially reprinted as a full page advertisement in the New York Times of November 5, 1981. He stated:

> I would not be standing here today if my skin were white or my religion were Presbyterian. I am here today only because my skin is yellow and my religion is Unification Church. The ugliest things in this beautiful country of America are religious bigotry and racism.

In response to defense efforts to waive a trial by jury, the prosecutor wrote a letter to Judge Goettel dated March 11, 1982 stating her opposition and, referring to the excerpt quoted above, adding that defendants had raised—and circulated worldwide—questions about "the integrity and

motives of this prosecution." It was the prosecutor's conclusion that a single factfinder would be placed in an "untenable" position and that there was an overriding public interest in the appearance as well as the fact of a fair trial, which could be achieved only by a jury. The government insisted that employing this normal and preferable mode of disposing of fact issues in a criminal trial would defuse the public criticism that had been leveled by Moon.

The defense argues that, on the contrary, insistence upon a jury trial had the effect of punishing Moon for exercising his First Amendment right of free speech. The punishment, so the argument runs, took the form of denying Moon a benefit, i.e., a nonjury trial, that he would otherwise have been entitled to. The underlying rationale for this argument is that Moon and his followers had received such negative press that, regardless of the government's protestations, it was impossible to obtain a fair trial with a jury and that this state of affairs was only exacerbated by Moon's speech.

 Trial by jury is a constitutional right provided in Article III Section 2 of the Constitution. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." Nothing in the Constitution guarantees one the right to select his own tribunal or the right to a speedy and public trial by a fair and impartial judge. The right to trial by jury is a benefit granted an accused, *see Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 380, 99 S.Ct. 2898, 2905, 61 L.Ed.2d 608 (1979), which a defendant has the power to waive. But before a waiver can be effective, the consent of the prosecutor and the sanction of the court must be obtained. *See Patton v. United States,* 281 U.S. 276, 312, 50 S.Ct. 253, 263, 74 L.Ed. 854 (1930); Fed.R.Crim.P. 23(a). The ability to waive the benefit does not import a right to claim its opposite. And the Supreme Court has stated that because of "confidence in the integrity of

the federal prosecutor, Rule 23(a) does not require that the Government articulate its reasons for demanding a jury trial at the time it refuses to consent to a defendant's proffered waiver." *Singer v. United States,* 380 U.S. 24, 37, 85 S.Ct. 783, 791, 13 L.Ed.2d 630 (1965).

■ Conclusive as that statement might appear, it does not end the matter. For the Supreme Court has also held that even though one has no right to a government benefit, such benefit may not be denied and when granted may not be conditioned or later revoked for a reason that infringes an individual's constitutional rights, especially First Amendment freedoms. *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Sherbert v. Verner,* 374 U.S. 398, 405, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963). But the defendant has presented no facts on this record that convince us that the government's reason for refusing to consent to a bench trial was impermissibly to punish Moon for exercising his First Amendment rights. Instead, it appears that the public prosecutor elected, as was her right and based upon the reasons she gave, to have this case tried in the constitutionally preferred manner. Without the factual predicate to support his argument, the defendant's claim of error evaporates.

### B. As the Denial of the Right to a Fair Trial

■ Moon also contends that prior to the voir dire there was an unacceptable risk that a fair jury could not be selected and therefore that the denial of a bench trial violated his right to a fair trial.[1] This argument, like the previous one, urges that there was a reasonable likelihood in advance that public animosity toward Moon and his religion would prevent a fair trial. In our view this debatable contention could be satisfactorily resolved only upon the voir dire of prospective jurors. *See Application of Cohn,* 332 F.2d 976, 977 (2d Cir.1964). Ordinarily, insisting that a defendant undergo a jury trial against his will does not run afoul of a defendant's right to due process and a fair trial. *Singer v. United States,* 380 U.S. at 34–36, 85 S.Ct. at 789–790. Certainly we recognize, though, that there might be cases where the circumstances are so compelling that for the court to countenance the government's insistence on a jury trial over the defendant's request to be tried by a judge alone would deny the defendant a fair trial. *See Singer v. United States,* 380 U.S. at 37, 85 S.Ct. at 791. This is not such a case. Compelling circumstances are not demonstrated simply by claims of an atmosphere poisoned by a negative press. The validity of such claims is properly shown upon a voir dire of prospective jurors. The trial court, wisely recognizing that this was a safer avenue to follow in order to ascertain whether a fair jury could be obtained, properly reserved until after the voir dire its option to overrule the government's refusal to waive a jury trial.

■ Additionally, review of the transcript of the seven painstaking days of jury selection, involving the interrogation of 63 out of 200 veniremen for the panel and 17 for the six alternate positions, convinces us of the accuracy of the trial court's finding after selection was completed that "we have gotten a jury which is, if not totally free from bias, by and large capable of putting aside the bias they have and deciding the case on the merits of the charges." Jurors need not be totally ignorant of a defendant in order to be fair and unbiased. *See Dobbert v. Florida,* 432 U.S. 282, 302, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977); *Murphy v. Florida,* 421 U.S. 794, 798–800, 95 S.Ct. 2031, 2035–2036, 44 L.Ed.2d 589 (1975). Even where a prospective juror has formed

---

1. Appellants also contend that the subject matter of this tax fraud prosecution, together with the sheer volume of complicated exhibits, turned this trial into one of mesmerizing complexity. We believe the case was not so complex as to be beyond the grasp of the jury.

While the trial lasted over six weeks and there were hundreds of exhibits introduced, very few of them were complicated. The jury's task came down to deciding the basic issue of ownership of the Chase accounts and the Tong Il stock.

some preconceived opinion as to the guilt of the accused in the case on trial the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based on the evidence in the case. *Murphy v. Florida,* 421 U.S. at 799–800, 95 S.Ct. at 2035–2036; *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961); *United States v. Murray,* 618 F.2d 892, 899 (2d Cir.1980). Significantly, defense counsel only challenged one of the 12 jurors for cause, and the denial of that challenge is not raised on appeal. *See Beck v. Washington,* 369 U.S. 541, 557–58, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1962) (failure to challenge for cause prospective jurors is strong evidence defendant considered jurors not biased). Absent a clear abuse of the trial court's discretion, one that results in manifest prejudice to defendants, the finding made by the trial judge that the jury was fair and unbiased must be upheld. *See United States v. Brown,* 644 F.2d 101, 104 (2d Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981).

## II

## SUFFICIENCY OF THE EVIDENCE

### A. *Counts Two Through Six*

Defendants argue that the evidence presented was insufficient to find them guilty beyond a reasonable doubt on the substantive tax offenses charged in Counts Two through Six. To find defendants guilty of fraud in the filing of Moon's income tax returns, the jury had to find that statements contained in the returns which were verified as true were in fact false, and that these false statements were willfully made. Viewing the evidence in the light most favorable to the government and considering that all questions of credibility are within the exclusive province of the jury, there was ample evidence to find that Moon willfully filed false tax returns for the years 1973–75 and that Kamiyama willfully aided and abetted in the false 1974 and 1975 filings.

### (1) *Falsity*

#### (a) *Moon's Financial Picture*

We examine first the evidence regarding falsity. In order to do so we sketch briefly defendants' financial picture. In November 1972 when Reverend Moon visited the United States he was already a successful businessman, being founder and chairman of the boards of eight publishing and manufacturing companies in his native Korea. The Unification Church of New York had begun purchasing and importing ginseng tea and marble vases from some of Moon's Korean companies. In June 1973 Kamiyama incorporated Tong Il Enterprises in New York which purchased and sold these items. Moon subscribed to 500 shares for $50,000 which, according to some of the corporation's records, he paid for. His wife subscribed to 200 shares for $20,000 and Kamiyama subscribed to 100 shares for $10,000, all from an original issue of 1005 shares. Thus, Moon and his wife had 70 percent control of the company and Moon was elected chairman of its board. Although 500 shares were issued to Moon, he did not actually pay for them, as he had originally obligated himself to do. Instead the stock was issued to him without payment in 1973, apparently in exchange for various assets transferred to Tong Il by other corporations which Moon controlled. In the spring of 1974 Moon began drawing a salary from this enterprise as a "business consultant" and at the same time opened a checking account, known as the "household account," in the Chase Manhattan Bank into which his salary was deposited.

As noted, about a year earlier, Moon had opened a different personal checking account ("checking account") and an individual savings account at the Chase Manhattan Bank. Subsequently, on April 9, 1973, Moon personally deposited $100,000 into the checking account. During the three-year course of his relationship with the bank approximately $1,724,774 was deposited into Moon's various accounts. Commencing in late 1973 he transferred from the checking and savings accounts, and directly deposited, a substantial portion of the

$1.7 million in high-yielding Chase time deposits. These time deposits were also held in Moon's name, and on his instructions they, together with the interest earned on them, were rolled-over. The total interest earned on all the Chase accounts in the relevant years, 1973–75, was approximately $106,650.

With respect to living expenses, the household account at Chase was used by Moon primarily to pay the private school expenses of his children. Ordinary personal and household expenses were paid for by the Holy Spirit Association for Unification World Christianity (HSA–UWC), incorporated in California in 1961 as the American branch of the Unification Church.

Having outlined the Tong Il stock and Chase accounts transactions, we complete Moon's financial picture by describing the real estate dealings pertinent to this case. A month before Moon's November 1972 arrival in the United States HSA–UWC purchased "Belvedere," the 20 acre Bronfman estate in Tarrytown, New York, for $750,-000. The seller took back a $550,000 mortgage and the $200,000 balance was paid by HSA–UWC. When Moon came in 1972 he occupied the main house on this estate. In the fall of 1973 an adjoining estate became available. It was purchased that October in the name of HSA–UWC for $631,827. To complete the purchase Moon loaned HSA–UWC $361,827 from the checking account at Chase. He also issued his personal check to Sotheby Park Bernet for $51,160 to pay for furnishings in the estate, which he named "East Garden." In late 1973 Moon's family came from Korea. He and his staff moved out of Belvedere and, together with his family, took up residence in East Garden.

### (b) Evidence

Under the government's theory of the case, Moon failed to report interest income

earned on the Chase Manhattan Bank accounts that he purportedly owned and income recognized as a result of a distribution of Tong Il stock to him at no cost.[2] Appellants' principal contentions at trial were that the Chase accounts and Tong Il stock belonged to the Church, that Moon merely held these assets as the nominee, agent, and/or trustee of the Church, and that therefore he was not taxable on either the Chase interest or Tong Il stock distribution.

In concluding that the jury properly found the Chase accounts and Tong Il stock to be Moon's personal property, we start first with the fact that the Chase accounts and Tong Il securities were maintained in Moon's name and controlled by him. Second, some funds clearly destined for Church entities were put in existing Church bank accounts which were owned and controlled by Church corporations. Third, from his handling of the Chase accounts and Tong Il stock Moon seemingly regarded them as his own, not as belonging to the Church. Fourth, high ranking members of the Church were told that the Chase funds belonged to "Father," not to the Church.

The government introduced evidence that Moon actually considered the Chase accounts to be his own property rather than the Church's, and that he used funds from the accounts for expenditures which the jury could have concluded were personal in nature. Several examples will suffice. In September 1975 Moon and Kamiyama purchased shares in a new bank, Diplomat National Bank in Washington, D.C., $80,000 worth of stock for Moon and $75,000 for Kamiyama. The funds used to pay for the stock were derived from one of Moon's time deposits at Chase and transferred into the household account, and later a check drawn

---

**2.** Since the defendant's only argument regarding the Tong Il stock is that it belonged to the Church rather than to Moon, it appears that he concedes the taxability of the distribution if in fact the stock belonged to Moon personally. The defendant did not assert below and does not assert now that the distribution constituted

a gift to him from Tong Il, which gift of course would not be subject to the federal income tax. The jury could well have found that the whole transaction amounted to an indirect dividend to Moon from the companies under his control which transferred assets to Tong Il.

on that account was made payable to the Diplomat National Bank.

In 1973, when HSA–UWC purchased East Garden, Moon loaned HSA–UWC $361,827 from the checking account to complete the $631,827 purchase. This transfer was carried on HSA–UWC's books as a personal loan from Moon. Later, when HSA–UWC was unable to meet mortgage payments on the $500,000 mortgage on "Belvedere," Moon broke a Chase time deposit and loaned $175,000 to the Church organization. HSA–UWC repaid Moon $70,000 of this loan, writing off the $105,000 balance as a personal contribution from Moon. The jury might well have inferred from the bookkeeping entries concerning these transactions that HSA–UWC considered the Chase funds Moon's exclusive property.

In November 1973 Moon directed that title to East Garden be transferred to him because he had supplied most of its purchase price from his personal funds, i.e., the Chase accounts. But before Moon's subordinates could complete this transfer they were informed by Church lawyers that Moon would have to pay the estate's fair market value of $700,000 in order to avoid adverse tax consequences for himself and the Church. To create this $700,000 consideration, loans to HSA–UWC from Moon amounting to $361,827 were falsely increased on the Church books to $700,000. Moon then signed a Release and Cancellation of Indebtedness Agreement covering the $700,000 purchase price for East Garden. Even though this document was never actually used, by signing it Moon implicitly acknowledged that the $361,827 used to pay for the property, which had come from the Chase accounts, was his own.

Finally, the documents given by the defendants to the Justice Department to support their theory that Moon held the Chase funds and Tong Il stock other than individually were revealed to be fraudulently backdated. To understand how this came about it is helpful to capsulize Moon's finances at the beginning of 1974. At that time Moon had $556,000 in Chase time deposits, an outstanding loan of $361,827 to HSA–UWC made in connection with the purchase of East Garden, $50,000 and $4,000 in his Chase checking and savings accounts respectively and $50,000 worth of Tong Il stock. East Garden had $51,160 worth of furnishings purchased from Sothebys. These assets had a value in excess of a million dollars. At this point the leaders of HSA–UWC consulted a Washington law firm regarding a number of business and financial matters, including the transfer of East Garden into Moon's own name. The leaders were advised by counsel to keep Moon's assets separate from those of the Church, that Moon had to file a personal income tax return, that as a resident alien he was taxable on all income to him from whatever source, and that the custom of providing substantial gifts to Reverend Moon in kind or cash should be terminated.

After meeting with lawyers and accountants on January 3 and 4, 1974 it was decided not to have these professionals handle Moon's 1973 tax return. Instead, Kamiyama was to be in charge, preparing the return under Moon's instructions. Records were produced to account for the nearly 1.8 million dollars deposited into the Chase Manhattan Bank and to show these as the Church's assets rather than Moon's. Three hundred and fifty thousand dollars was accounted for as "loans" from leaders of Unification organizations in England, France, Germany, Italy and the Netherlands. Each loan, signed by Kamiyama, bore a date and amount which matched, or in combination matched, a deposit into the Chase account in 1973. Another 1.2 million of cash deposited into Chase was accounted for by Japanese church members who, it was said, carried this money into the United States in amounts of three or four thousand dollars each. A ledger was kept—the Japanese Family Fund Ledger—with hundreds of entries showing a name, date of contribution and amount. The ledger also showed disbursements labelled "donations" which matched precisely the deposits into the Chase accounts.

With respect to the loans from the European leaders ostensibly made and entered into a loan ledger in 1973, a watermark expert established at trial that the paper on which these 1973 transactions occurred had not been manufactured until 1974. The Japanese Family Fund Ledger was also shown to be manufactured after the fact. Because some of the bank deposits consisted not of cash but of checks from sources other than Japanese donors, the government was able to demonstrate the falsity of the ledger. A comparison of Chase deposit slips, which included checks not reflected in the ledger, with the Japanese Family Fund Ledger revealed "donation" disbursements on the same date in the exact amount of each Chase deposit. A discrepancy appeared because the ledger disbursement indicated that the entire deposit in the same amount as the deposit slip was cash, while the proof at trial demonstrated that the deposit was partly in checks. Thus unravelled it appeared that Kamiyama's aide, Yukiko Matsumura, had constructed the ledger simply by working backwards from Moon's bank statements and deposit slips to create fictitious cash sources to account for all of the deposits at Chase. Since she mistakenly thought each deposit was all cash the ledger entries and the total amount deposited into the bank accounts matched perfectly. When checks were included in the totals, however, the fraudulently backdated nature of the ledger was clearly revealed.

■ In sum the government presented evidence at trial that Moon controlled the Chase accounts and Tong Il stock, held them in his own name, considered the Chase accounts his own, used the accounts in a seemingly personal manner, and was regarded by other Church figures as owning the assets personally. Additionally, the documents produced by the defendants to show that the assets were in fact Church property proved to be backdated and false. Viewing this evidence in the light most favorable to the government, it is sufficient to establish that Moon owned the Chase accounts and Tong Il stock in a personal capacity. Because he owned the assets, he should have reported the interest and stock distribution income on his tax returns. Since he failed to do so, his 1973–75 returns were false.

### (2) Willfulness

We turn to the evidence that Moon willfully filed income tax returns for the 1973–75 tax years knowing that these returns contained false information and that Kamiyama willfully aided and abetted the 1974 and 1975 filings. Willfulness in tax fraud cases has become equated with bad faith, want of justification or knowledge that the taxpayer should have reported more income than he did. *See United States v. Bishop,* 412 U.S. 346, 360, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973). The Supreme Court collected the formulations cited in *Bishop* and reduced them to the statement that willfulness in the context of filing a false income tax return "simply means a voluntary, intentional violation of a known legal duty." *United States v. Pomponio,* 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976).

■ The evidence presented on this issue, although circumstantial, was sufficient to sustain the jury's verdict. The salient points follow. Moon signed his 1974 and 1975 returns, acknowledging that he had read them and that they were accurate, and he signed an RSC–12 form giving similar assurances as to his 1973 return; Moon and Kamiyama both knew of Moon's interest income at Chase and income from the distribution of Tong Il stock; Moon actively supervised all of his personal financial matters and never signed anything until he understood it; Moon's 1973 "personal income tax matters [were] being handled under his instructions by Mr. Kamiyama" (quoting from a wire communication sent by a Unification Church official); Kamiyama participated in the completion of Moon's 1973 returns directly; and the public accounting firm that prepared Moon's 1974 and 1975 returns was provided with false information and fraudulently backdated documents. As an example of this last point, the preparers of the 1974 return were

shown the "loans" ledger of transactions from the European Church leaders to Kamiyama. These "loans" amounted to $200,000. The ledger then reflected that Kamiyama made a loan to Moon (backdated and signed by both defendants) for the $200,000. The accountants were advised that these loan agreements evidenced the fact that the funds on deposit in the Chase Manhattan Bank earning interest in Moon's name were not his funds, but were held by him only as nominee for the Church. Noteworthy is the fact that appellants' initial tax attorneys informed HSA–UWC leaders prior to the filing of Moon's 1973 return that he would have to pay taxes on all of his United States income, from whatever source it was derived. No interest income was declared on the 1973 return, and only small amounts the two succeeding years. For example, Moon's 1973 return declared $14,458 income from the Unification Church of New York and no interest earned, although there was earned interest of $3,208 on the Chase accounts. On the 1974 return, reported income was $20,520 from Tong Il and $254 interest earned, although the deposits at Chase earned $59,079. On the 1975 return Tong Il income was reported at $37,080 and interest of $267, although the accounts at Chase earned $43,841. Moon apparently knew that the interest he *reported* in 1974 and 1975 on the small savings account at Chase was income to him; thus it seems reasonable for the jury to conclude that he also knew that the interest on his time deposits at the same bank, which came from withdrawals from the checking and savings accounts, was also income to him. We are unable to accept defendants' argument that as new residents of the United States they were unfamiliar with tax law. Not only are both defendants sophisticated businessmen, but they had at their disposal a small army of tax attorneys and accountants whose advice, unfortunately, was not sufficiently heeded.

Finally, Moon's signing of the aborted Release of Indebtedness on the East Garden transfer, discussed earlier, was an acknowledgment by him that the Chase accounts in his name were actually his funds and at the same time evinced his willingness to sign a false document to escape personal income tax liability.

### B. The Conspiracy Count (Count One)

■ Moon next argues that the government presented no evidence that he personally entered into or participated in a conspiratorial agreement to file false tax returns or obstruct the tax fraud investigation against him. The facts adduced at trial contained ample evidence that several subordinates of Moon engaged in a continuing and agreed upon course of conduct amounting to a conspiracy to file false returns and obstruct justice. Included among these was Kamiyama, whose participation in the preparation of the 1973 return and whose part in the false and backdated "loan" agreements submitted to the accountants for preparation of the 1974 and 1975 returns has already been recounted. Viewed in the light most favorable to the government, Moon's argument of lack of involvement is unpersuasive. Not only was Moon the person with the greatest personal stake in the success of the acts in question, but there was proof that he exerted close scrutiny over his own personal affairs and was aware of the information contained in his tax returns. He signed one of the postdated loan agreements (the $200,000 loan from Kamiyama to Moon) which was later submitted to the IRS in connection with the audit of his returns. Finally, Moon and his associates, through Moon's personal lawyers, submitted to the Justice Department in 1981 the same falsely backdated documents that had earlier been submitted to the IRS and to Moon's accountants. In short, there was ample evidence for the jury to find that Moon participated in a conspiracy to file false tax returns and/or obstruct justice.

### III

### JURY INSTRUCTIONS

Moon objects to the trial court's instructions to the jury in three particular areas. First he contends that the instructions on

the law of trusts were erroneous and incomplete. Second, he argues that certain instructions violated the First Amendment's Religion Clauses. And third he questions the instructions on intent. Although specific objections overlap to some extent, we will deal with them separately.

## A. Charge on Trusts

Perhaps the most crucial area concerns the trial judge's charge on the law of trusts. Despite the fact that Moon did not, until late in the trial, clearly raise the claim that he was holding the assets in question in trust for the International Unification Church movement, the district court saw fit to instruct the jury on this defense theory. The defendant now objects to what he claims are errors and omissions in this charge. We believe that defendant's contentions fail, first, because the trial court was not required to charge the jury on the trust issue and, in any event, because the trust instructions were neither erroneous nor prejudicial.

▇▇▇ As a preliminary matter, it is essential to inquire as to who had the burden of proof on the trust issue. Of course, the government must prove every element of the offense charged beyond a reasonable doubt. One of those elements is that Moon had income from the Chase accounts and the Tong Il stock distribution that he failed to report. Defendant may then present an "affirmative defense," one which does not rebut an element of the crime, or some other defense which rebuts an element of crime. If defendant asserts an affirmative defense he bears the burden of proof on it. Here, since the defense theory that Moon was acting only as a trustee rebuts the "ownership" element of the crime charged, it was not an affirmative defense. Hence, the only burden on Moon was to present a prima facie case that he held the assets in trust. If the defense had successfully introduced into evidence this prima facie rebuttal of the element of ownership, the trial court would have been obliged to instruct the jury on the law of trusts and the government would still have had to prove

beyond a reasonable doubt that Moon "owned" the assets.

▇▇▇ A careful review of the evidence, however, reveals no proof that Moon actually held the subject funds in trust. In order to establish the defense of trusteeship, defendants would have had to produce evidence of the donors' intent to create a trust. Yet the only evidence even remotely touching on this issue was the testimony of Church members Matsumura and Porter and German Unification Church leader Werner who simply stated that they gave money to Moon, intending it as a donation to their church. They never mentioned the word "trust" or, more importantly, gave any indication that they intended to create a trust relationship. Accordingly, this evidence only demonstrated the charitable intent of the contributors, not the clear expression of intent necessary to create a trust.

▇▇▇ Under New York law, which governs the issue of ownership, it is well settled that a donor's intent to create a trust must be clear and unequivocal. This rule is not limited to private trusts, as defendant claims, since the creation of a charitable trust also requires a clear expression of intent. *See, County of Suffolk v. Greater New York Councils, Boy Scouts of America,* 51 N.Y.2d 830, 832–33, 433 N.Y.S.2d 424, 413 N.E.2d 363 (1980); *Lefkowitz v. Cornell University,* 35 A.D.2d 166, 173, 316 N.Y.S.2d 264 (4th Dep't 1970) (while no particular words are required to create a charitable trust, the words relied upon to create such a trust must be unequivocal), *aff'd,* 28 N.Y.2d 876, 322 N.Y.S.2d 717, 271 N.E.2d 552 (1971); 4 *Scott on Trusts* § 348, at 2769–70 (3d ed. 1967) (as with a private trust, person creating a charitable trust must manifest by his words or conduct an intention to create it); *Restatement (Second of Trusts)* § 351 (1959).

The dissenting opinion, unfortunately, obscures the intent requirement, focusing instead on a totally distinct and, for purposes of this analysis, inapposite issue—the policy of upholding charitable trusts whenever

possible by construing their terms liberally. For this proposition, the dissent cites *In re Price's Will,* 264 A.D. 29, 35 N.Y.S.2d 111 *aff'd* 289 N.Y. 751, 46 N.E.2d 354 (1942), and *In re Durbrow's Estate,* 245 N.Y. 469, 157 N.E. 747 (1927), neither of which controls here. Each of these cases involved a written will which plainly expressed the testator's intent to create a trust. More specifically, *Price's Will* applied the *cy pres* doctrine and held that a charitable trust already in existence survived even after its primary purpose had terminated. Similarly, *Durbrow's Estate* held that a charitable trust will not fail for want of a definite beneficiary. It is true, therefore, that both of these cases support the policy of upholding charitable trusts; however, neither stands for the proposition that a charitable trust comes into being absent the clearly expressed intent to create it. Since the intent to create such a trust was clearly indicated by the written wills in *Price's Will* and *Durbrow's Estate,* the question of intent to create a charitable trust was not in issue.

█ Contrast these cases with the present one. Here, there is no evidence of intent to create a *trust,* only the vague testimony of three witnesses establishing that a charitable *gift* had been made to the Church. Although we agree with the dissent's assertion that charitable trusts must be liberally upheld, there is no rule of law that presumes simply from a charitable gift the donor's intent to create a trust.

Thus, since defendants failed to make a prima facie case that Moon held the Chase accounts and Tong Il stock in trust, the trust issue was one that need not have been charged to the jury in the first instance. Any purported errors or omissions in the instructions were therefore harmless.[3]

In any event, we find that the defendant's objections to the trust instructions are without merit. Moon challenges the use of what he terms a "laundry list" of factors which the trial court instructed the jury to consider in determining whether a trust existed. He now asserts that important factors were omitted from this list, the vital issues of source of funds and donor's intent were buried in this extensive list, and some factors were misleading.

The claim of omissions is spurious, as all the factors alleged to be omitted were clearly charged. In connection with the first of these factors, i.e., whether the International Unification Church movement "had a specific organizational structure, written charter or constitution," the dissent believes that Judge Goettel should have said that a specific organizational structure was not a prerequisite to the existence of a charitable trust. But, the record reveals that immediately following the list of factors, Judge Goettel did so charge in the following language:

As I have mentioned, you may consider whether the International Unification Church Movement had a specific organizational structure in making your decision. *However, the lack of a formal corporation does not prevent a religious movement from being the beneficial power of property held in the name of another* (emphasis supplied).

It ill-behooves an appellate court to engage in word-by-word parsing of a jury charge, *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d (1973), substituting its own choice for those equally appropriate words already in the charge. With regard to the last two objections, the dissenting opinion is also critical of the trial court, not for its failure to charge correctly, but for its failure to instruct the jury to accord the greatest weight and thereby emphasize the factor of the "intent of the parties" who gave property to Moon. Each of the factors referred to was correctly stated by the trial court and all of them were equally relevant to the jury's determination. Undue emphasis on any was not required. The "list" was slightly over one

---

**3.** The instructions on the law of trusts were essentially correct, as discussed *infra,* and occupied only a very small portion of the jury charge. Therefore, even though these instructions were not required, their inclusion could not have confused or misled the jury.

half a page; it was hardly extensive and no important factor was buried.

Moon and the dissent also object to the "if-then" language in the following instruction on the ground that it impermissibly shifts the burden of proof to the defense to show that the interest on the Chase accounts was not taxable to him:

> If you find that the funds in the Chase accounts were the property of International Unification Church Movement or were held in trust by Moon for the International Unification Church Movement and used for church purposes and that the interest on those funds also belonged to the International Unification Church Movement and were used for it, then that interest would not be taxable income to Moon.

This "if-then" formulation did not shift the burden of proof to defendants to prove their innocence. First, the charge contained 30 separate instances properly stating the burden of proof, and read as a whole and in context, the charge on this particular issue clearly states the correct burden. Second, the implication, if any, is even stronger in Moon's own written request to the trial judge [4] which contained, in addition to this subject, five other "if-then" formulations. Third, since no objection was made to the trial court's charge as given, it was waived. *See United States v. Praetorius,* 622 F.2d 1054, 1061–62 (2d Cir. 1979), *cert. denied,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980). This belated argument is thus totally without merit.

 Moreover, we find no error in the charge that trust property diverted is taxable to the extent diverted. The objections raised are that this "diversion" theory was not contained in the indictment, no instruction was given on partial diversion, and there was no explanation by the trial judge of what "diversion" means. Since diversion was not an element of the crime charged, it was not required to be included in the indictment. The crucial point is that

Moon was indicted, tried and convicted for his false and fraudulent failure to report taxable income. Further, in response to the trust defense raised at trial, the court did properly instruct the jury on partial diversion when it charged that the funds diverted to Moon's personal use became taxable "to the extent so diverted." Obviously, the word "divert" is in common enough use and understandable by ordinary jurors, so as to require no explanatory charge. *Cf. United States v. Valencia,* 645 F.2d 1158, 1167 (2d Cir.1980) (term "hesitation" did not need to be clarified).

 Finally, the trial judge properly charged that "there is no trust if the person who receives the money is free to use it for his own benefit." This instruction was in accord with familiar law that the same person may not at one and the same time be the sole trustee and sole beneficiary of a trust. *In re Phipps,* 2 N.Y.2d 105, 108, 157 N.Y.S.2d 14, 138 N.E.2d 341 (1956); 61 N.Y. Jur., *Trusts* § 214, at 395 (1968); *Restatement (Second) of Trusts* § 341(1) (1959).

### B. Religion Clauses Objections

Moon objects to instructions that permitted the jury to find that if he used the Chase funds for his own business investments or personal ends—that is for other than religious purposes—such use would indicate the lack of a trust relationship. The defense urges that this instruction violated the First Amendment Religion Clauses because the trial court was obligated to charge that the jury must accept as conclusive the Unification Church's definition of what it considered a religious purpose. Under the definition now advanced as the Church's, *any use* of these funds by Reverend Moon was for religious purposes.

 This argument overstates the scope of the protections afforded by the Religion Clauses. The term "religion" was defined by the Supreme Court nearly 100

---

**4.** If you find that the Chase time deposits and the Tong Il stock were in fact the property of the international Church Movement, rather than the personal property of Rev. Moon, then the exclusion from Rev. Moon's tax returns of the interest earned by the time deposits and the Tong Il stock was proper, and did not make those returns false.

years ago in *Davis v. Beason*, 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637 (1980) as having reference to a person's views of his relations to his Creator. This definition seems unduly narrow today. In every religion there is an awareness of what is called divine and a response to that divinity. 7 *The Encyclopedia of Philosophy* 143 (1972). But, there are religions which do not positively require the assumption of a God, for example, Buddhism and the Unitarian Church. Hence, a broader definition of the word religion—one which we think more accurately captures its essence—is that formulated by the pre-eminent American philosopher, William James, who said religion means: *"the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine."* W. James, *The Varieties of Religious Experience* 31 (1910). In referring to an individual's relation to what he considers the divine, Professor James used the word "divine" in its broadest sense as denoting any object that is godlike, whether it is or is not a specific deity. *Id.* at 34. Therefore, under the Religion Clauses, everyone is entitled to entertain such view respecting his relations to what he considers the divine and the duties such relationship imposes as may be approved by that person's conscience, and to worship in any way such person thinks fit so long as this is not injurious to the equal rights of others. "It was never intended or supposed that the amendment could be invoked as a protection against legislation for the punishment of acts inimical to the peace, good order and morals of society." *Davis v. Beason*, 133 U.S. at 342, 10 S.Ct. at 300. The Supreme Court continued, "however free the exercise of religion may be, it must be subordinate to the criminal laws of the country, passed with reference to actions regarded by general consent as properly the subjects of punitive legislation." *Id.* at 342–43, 10 S.Ct. at 300–01. To foreclose a court from analyzing a church's activities as needed to determine whether those activities violated a statute, on the ground that the First Amendment forbids such inquiry, would

mean that there are no restraints or limitations on church activities. *See Christian Echoes National Ministry, Inc. v. United States*, 470 F.2d 849, 856 (10th Cir.), *cert. denied*, 414 U.S. 864, 94 S.Ct. 41, 38 L.Ed.2d 84 (1973). The "free exercise" of religion is not so unfettered. The First Amendment does not insulate a church or its members from judicial inquiry when a charge is made that their activities violate a penal statute. Consequently, in this criminal proceeding the jury was not bound to accept the Unification Church's definition of what constitutes a religious use or purpose.

*Holy Spirit Association v. Tax Commission*, 55 N.Y.2d 512, 518, 450 N.Y.S.2d 292, 435 N.E.2d 662 (1982), is inapposite. That case dealt with the inquiry that a court may conduct when determining whether a religious organization is entitled to a real property tax exemption under New York law. The principles there enunciated upon which appellant relies are relevant in that context and do not serve as precedent in a federal criminal tax prosecution.

Moon also argues that an omission from the charge—the so-called "Messiah" defense—permitted the jury to look at the assets held in his name "secularly," in violation of the First Amendment. Counsel asserts that Moon's worldwide followers believe him to be "potentially the new Messiah." From this theological premise the argument is made that Moon personifies the church movement and is indistinguishable from it. Since the Unification Church movement can owe no taxes on income derived from church-related activities, the defense argues that neither can Reverend Moon.

 We do not accept this defense. The fact that Moon is the head of the Church does not mean that the Church itself is not a distinct and separate body. Moon's spiritual identity as leader of the Unification Church movement and his legal identity as a taxpayer are not the same. He is the spiritual leader of the Church, as the Pope is the spiritual leader of the Roman Catholic Church, but he also has a legal identity as a distinct, individual hu-

man being. It is in this latter capacity that he, or the Pope, could have taxable income. It has long been held that a church may hold property legally free from government interference because such inference would violate the First Amendment. *Terrett v. Taylor,* 13 U.S. (9 Cranch) 43, 51–52, 3 L.Ed. 650 (1815). But where property held individually and used personally gives rise to income, that income is subject to taxation. To allow otherwise would be to permit church leaders to stand above the law, a view we have previously rejected.

■ Finally, contrary to defendant's argument, the failure to charge that assets which came from church sources to be used for church purposes are not taxable to Moon, did not violate the "neutral principles" approach outlined in *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). In *Jones* the Supreme Court held that the First Amendment prohibits the resolution of intra-church property disputes by civil courts interpreting religious doctrine, and required that civil courts defer the resolution of such issues to the highest hierarchical church organization. This "neutral principles of law" approach is one of several approved methods of resolving church property disputes between groups within the church. *Id.* at 602, 99 S.Ct. at 3025. The doctrine has no application to the facts of this case.[5]

### *C. Charge on Intent*

■ The final jury charge objections deal with the issue of intent in two particulars. First, Moon objects to the "if-then" formulation contained in the following instruction:

> *If* you find that Moon provided the person who prepared the tax return with full and honest information as to his income and that Moon then adopted, signed and filed the tax returns as prepared in the belief that the return contained the full

and honest information he had provided to the preparers regarding income, *then* you must find defendant Moon not guilty.

(emphasis added). This objection is rather surprising, in light of the fact that the defendant requested the following charge:

> *If* you find Rev. Moon and his representatives acted in good faith in providing the information that they believed to be relevant to the determination of Rev. Moon's tax liability and that they responded fully and candidly to Peat, Marwick's requests for additional information relating to the Chase accounts, *then* you must find defendant Rev. Moon not guilty of the false return counts for 1974 and 1975.

(emphasis added). Needless to say, the defendant cannot now be heard to complain of the same "if-then" formulation he requested. In fact, this requested language was preceded by a sentence which shifted the burden of proof even more emphatically to the defendant than did the charge given by the court.

■ Second, the intent charge gave the jury factors to consider in evaluating defendant's state of mind. Among those mentioned as an affirmative act designed to conceal consciousness of wrongdoing was "dealing in cash." Moon claims that dealing in cash is a common practice in the Orient and could not, therefore, be interpreted as evidence of intent to conceal. In tax fraud cases evidence tending to show misconduct through extensive dealings in cash is properly admitted into evidence, *see United States v. White,* 417 F.2d 89, 92 (2d Cir.1969), *cert. denied,* 397 U.S. 912, 90 S.Ct. 910, 25 L.Ed.2d 92 (1970). It is, therefore, properly chargeable. And, in any event, the "dealing in cash" language was immediately followed by a balancing charge that "openness in conduct" could give rise to the inference that the taxpayer believed he had done nothing wrong and "had nothing to hide." [6]

---

**5.** Contrary to the defendant's contention, the trial judge *did* instruct the jury that lack of a formal organizational structure would not prevent the Unification Church movement from

being the beneficial owner of the property in question.

**6.** Moon also contends that this language contravened the Religion Clauses by inviting the

## IV

## MISCELLANEOUS ISSUES

### A. Selective Prosecution

▉▉▉ Both appellants contend that the prosecution mounted against them was impermissibly motivated by hostility toward their religion and that the district court erred in denying their request for discovery and a hearing on the issue of selective prosecution. In this Circuit, a defendant who advances a claim of selective prosecution must do so in pretrial proceedings, *see United States v. Taylor* 562 F.2d 1345, 1356 (2d Cir.), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977). The person asserting such a claim bears the burden of establishing *prima facie* both:

> (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974). No evidentiary hearing or discovery is mandated unless the district court, in its discretion, *see id.* at 1212, finds that both prongs of the test have been met. *See United States v. Ness,* 652 F.2d 890, 892 (9th Cir.), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981); *United States v. Catlett,* 584 F.2d 864, 866 (8th Cir.1978); *Berrios,* 501 F.2d at 1211. We cannot say on this record that the·district court abused its discretion in holding that appellants failed to demonstrate the necessary factual predicates for their claim of selective prosecution.

The only evidence offered pretrial in support of appellants' assertion of selective prosecution was to the effect that Congress had previously conducted an investigation into Korean-American relations (Koreagate), that such investigation had touched upon the Unification Church, and therefore that the government's prosecution of Moon could be seen to have stemmed from impermissible religious and/or political hostility. No other evidence was submitted in support of the motion. The proof before the trial court was wholly insufficient to mandate further inquiry or a hearing and the court's rejection of the claim of selective prosecution at that point was clearly proper.

Following the trial, and in an arguably untimely manner, appellants submitted additional "evidence" of selective prosecution. Specifically, they presented affidavits from four individuals who, while disavowing any knowledge of the government's motive in this case, asserted that they held church funds in their own names and did not pay taxes on interest earned on the funds. Moon also submitted a copy of a letter from United States Senator Robert Dole to the IRS requesting that it look into the Unification Church's tax exempt status. While acknowledging that Moon's status as a highly visible, religious leader may well have led to the audit of his tax returns, the district court reasoned that the government's decision to institute criminal rather than civil charges was a wholly separate decision and that the additional evidence of improper prosecutorial motive submitted by appellants still failed to satisfy the requirements of *Berrios.* We need not decide here whether appellants' post-trial submission of evidence regarding selective prosecution was too late; even considering that evidence, the district court correctly concluded that it was insufficient to meet the *Berrios* standard.

With respect to the first requirement of *Berrios*—proof that "others similarly situated" have not been prosecuted—the four above-mentioned affidavits of other church leaders did not adequately prove *Berrios'* first prong for two reasons. First, the government's theory against Moon was that the funds he held were his own personal

---

jury to treat the Church's practice of soliciting cash contributions from the public as suspect.

But the charge clearly refers to *Moon's* conduct and not Unification Church practices.

property and that therefore any interest earned on the funds was taxable to him. By contrast, the submitted affidavits describe situations involving persons who claim to hold church funds, as opposed to personal funds, in their own names and pay no taxes on interest earned by the funds. While Moon still contends that the funds he held were church property, at the time of this post-trial motion the jury had squarely rejected this theory. Second, this case also involved charges of perjury and obstruction of justice. Reference to these charges is totally ignored in appellants' analysis of whether similarly situated individuals have been prosecuted. In short, appellants simply failed to provide the necessary *prima facie* evidence that others similarly situated have not been prosecuted.

As for the second prong of *Berrios* —proof that the government's decision to prosecute was based on impermissible considerations of race and/or religion—appellants rely heavily on the above-mentioned letter from Senator Robert Dole to the IRS. That letter merely requested an audit of the Unification Church's tax exempt status. It did not request an audit of Moon's personal tax status, suggest that he be criminally prosecuted, or indicate any racial or religious bias. Thus, we fail to see how the letter can be said to constitute *prima facie* evidence that the decision to prosecute Moon was the product of an impermissible motive. Appellants have therefore failed to satisfy either prong of *Berrios.*

We recognize that Moon is a controversial public figure who has been subjected to extensive media attention, much of it critical, and that his church may perhaps be viewed by the general public in an unfavorable light. These facts naturally tend to foster suspicion that the motive behind this prosecution might have been improper. That naked suspicion cannot serve as a substitute for the evidentiary showing mandated by *Berrios.* This case is not the first occasion when a controversial political or religious figure has been criminally prosecuted; and if history teaches us anything, plainly, it will not be the last. By their very nature, such highly visible cases will always engender some suspicion with respect to the government's *bona fides.* But to engage in a collateral inquiry respecting prosecutorial motive, there must be more than mere suspicion or surmise. If a judicial inquiry into the government's motive for prosecuting could be launched without an adequate factual showing of impropriety, it would lead far too frequently to judicial intrusion on the power of the executive branch to make prosecutorial decisions. Unwarranted judicial inquiries would also undermine the strong public policy that resolution of criminal cases not be unduly delayed by litigation over collateral matters.

### B. Interpreters Act

The next issue raised concerns the Court Interpreters Act of 1978, 28 U.S.C. § 1827 (Supp. V 1981). It provides in pertinent part that:

> The presiding judicial officer ... shall utilize the services of the most available certified interpreter ... in any criminal or civil action initiated by the United States in a United States district court ... if the presiding judicial officer determines ... that [a] party (including a defendant in a criminal case), or a witness who may present testimony in such action—
>
> (1) speaks only or primarily a language other than the English language; or
>
> (2) suffers from a hearing impairment (whether or not suffering also from a speech impairment)
>
> so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer, or so as to inhibit such witness' comprehension of questions and the presentation of such testimony.

28 U.S.C. § 1827(d) (Supp. V 1981). The Act further provides that persons, "other than witnesses," may waive, with the court's permission, their entitlement to a court-appointed interpreter and use their own translator instead. 28 U.S.C. § 1827(f) (Supp. V 1981).

During pretrial proceedings, Moon moved pursuant to § 1827(f) to waive the use of a court-appointed interpreter and to employ instead his own personally-selected translator. The district court ruled that Moon was free to use the interpreter of his own choice for purposes of translating the proceedings of the trial to him; but, that if Moon elected to testify, his testimony would have to be translated by a court-appointed, certified interpreter. Moon elected not to testify at his own trial.

While it was not argued below that the use of a court-appointed translator would impinge upon Moon's ability to communicate effectively with the jury, he now argues that the district court incorrectly construed § 1827(f) to preclude him from waiving the use of an appointed interpreter if and when he elected to testify. Specifically, he asserts that if he had testified, he would have been a party-witness, that a party-witness is not a "witness" within the meaning of § 1827(f), and that he therefore should have been allowed to waive the use of a court-appointed interpreter.

■ Moon's premise—that party-witnesses are somehow different from other witnesses for purposes of § 1827(f)—is untenable. The express language of subsection (f) makes no such distinction. While § 1827(d) does refer to "parties" and "witnesses" separately, this language does not create a distinction that must be carried over to subsection (f). The legislative history of § 1827(f) indicates that its purpose was to prevent *parties* from using untrustworthy translators. For example, the House Judiciary Committee Report in discussing the waiver provision refers to the danger of allowing "an individual to waive use of a certified interpreter and then to substitute their own personal interpreter [which] might create an opportunity for a *party* to use an unscrupulous interpreter." H.R.Rep. No. 95–1687, 95th Cong., 2d Sess. 5, *reprinted in* 1978 U.S.Code Cong. & Ad. News 4652, 4656. (emphasis added). To interpret the § 1827(f) term "witness" so narrowly as not to include party-witnesses, as Moon now suggests, would seriously undermine Congress's scheme of using independent interpreters to insure accurate translations. Thus, the district court correctly ruled that under § 1827(f), if Moon elected to testify, he would have to speak through a certified, court-appointed interpreter.

Moon further argues that requiring him to testify through a court-appointed interpreter impermissibly burdened his Fifth and Sixth Amendment rights to present a full defense. Citing *Brooks v. Tennessee*, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), he asserts that by depriving him of the opportunity to testify through an interpreter of his own choosing, the district court unconstitutionally restricted his decision as to whether or not he would testify. *Brooks* dealt with a state requirement that a defendant choosing to testify must testify at the beginning of the defense case before any other testimony is heard. This restriction is different from that now at issue. By forcing a defendant to decide whether he will testify at a point in the trial where a realistic assessment of the value of his testimony is difficult, the condemned state provision in *Brooks* restricted the privilege to remain silent because it put the defendant at an unfair tactical disadvantage in deciding whether to exercise his privilege. *Id.* at 610–11, 92 S.Ct. at 1894. The Interpreters Act does not make the assertion of the privilege similarly costly; it simply ensures that whatever testimony a defendant gives is honestly reported.

■ Moreover, even were requiring Moon to use a court-appointed interpreter to be viewed as some restriction on his ability to present a full defense, we observe that not all restrictions on a defendant's right to testify are *per se* impermissible. *See e.g., United States v. Bifield*, 702 F.2d 342, 350 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). For example, certain evidentiary and procedural restrictions are sanctioned where reasonably necessary to the achievement of a fair trial. *See id.* There is no evidence here that use of a court-appointed interpreter would have been unfair to Moon

and he has not suggested why it would have been. We regard § 1827 as reasonably designed to further the legitimate public interest in the fair administration of criminal trials. Such interest necessarily requires accurate and unbiased translations of trial testimony. Since the statute does not force a defendant who elects to testify to do so at any unfair disadvantage, we hold that the district court's application of § 1827 did not impermissibly restrict Moon's constitutional right to present a full defense.

### C. Evidentiary Problems

Both defendants raise questions regarding the admissibility of certain evidence at trial. Moon contends that the district court erred in allowing the government to introduce various immigration documents as similar act evidence. Kamiyama complains that the prejudice created by this evidence infected his trial by "spilling over." Additionally, Kamiyama challenges the admission during the government's rebuttal of evidence concerning his failure to file income tax returns in 1973 and 1974. Finally, both defendants claim that the government presented improper evidence to the jury regarding the religious practices of the Unification Church which they claim permitted them to be tried by religious innuendo.

After the defense rested, the government introduced documents relating to Moon's and his wife's applications for permanent residence in the United States. Contained in these documents were what the government maintained were false representations concerning the Moons' income for 1972 and 1973. The government argued that such evidence was probative of Moon's intent and knowledge because it was relevant on the question of absence of mistake regarding the preparation of the tax returns. We acknowledge the long held view of this Circuit that the trial judge is in the best position to weigh competing interests in deciding whether or not to admit certain evidence. *See United States v. Birney,* 686 F.2d 102, 106 (2d Cir.1982). Absent an abuse of discretion, the decision of the trial judge to admit or reject evidence

will not be overturned by an appellate court. *Id.* In reviewing the district court's determination we turn to Federal Rule of Evidence 401 which states that relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The government argues now, as it did at trial, that the submission of false immigration documents was relevant to Moon's intent in filing the false tax returns. We do not see how the submission of the false immigration papers to the Immigration and Naturalization Service in one instance is relevant to the defendant's intent to submit unrelated false papers to the IRS in another. *Cf. United States v. Halper,* 590 F.2d 422, 432 (2d Cir.1978) (submission of false tax return not relevant as to whether defendant intended to submit false Medicaid claims, and vice versa). Admission of this irrelevant evidence constituted an abuse of the trial court's discretion. Nevertheless, in light of the strong evidence relating to Moon's intent to file false tax returns, see Section IIA.(2) *supra,* the error must be deemed harmless. *See United States v. Quinto,* 582 F.2d 224, 235 (2d Cir.1978).

 With respect to Kamiyama's claim of spillover, the trial court's charge contained the cautionary instruction that the immigration documents were to "have no bearing on the case against [Kamiyama]." This instruction, coupled with the fact that the government made no claim that Kamiyama had any connection with the Moons' immigration papers, was sufficient to safeguard adequately against impermissible prejudice. *See United States v. Reed,* 639 F.2d 896, 907 (2d Cir.1981).

Kamiyama's major claim of evidentiary error relates to the admission of an IRS certificate indicating that there was no record of Kamiyama having filed federal income tax returns for the years 1973 and 1974. It was the government's contention that the certificate was relevant on the issue of Kamiyama's motive to create the Family Fund Ledger. Purportedly, Kami-

yama paid $10,000 cash for 100 shares of Tong I1 stock in 1973 and $110,000 cash for 1,100 shares of Tong I1 stock in 1974. The government argued that this "untraceable" cash was income and that to cover up the source of this money Kamiyama concocted the Family Fund Ledger. Since precisely the same scenario was established to account for the cash deposits in Moon's Chase accounts, the jury was entitled to infer from Kamiyama's conduct, so the government argues, that his handling of Moon's returns was with the requisite criminal intent and knowledge.

Nonetheless, there was no proof that Kamiyama had income sufficient to require him to file a tax return for the years in question. Simply purchasing stock with cash is not proof that Kamiyama had taxable income, since the cash might have come from some other source, see *Marcus v. United States,* 422 F.2d 752, 755 (5th Cir. 1970). Lacking a proper foundation, see *Dupree v. United States,* 218 F.2d 781, 784 (5th Cir.), reh'g denied, 220 F.2d 748 (5th Cir.1955), the IRS certificate was not relevant evidence and it was improperly admitted. We note that the certificate and the testimony accompanying it were admitted in the government's case on rebuttal and that this proof occupied an insignificant portion of the trial record, was not raised in summation, and was not in the trial court's instructions to the jury. Balanced against the other evidence of Kamiyama's guilt, we find this error harmless.

With respect to trial by religious innuendo, concededly there was testimony that members of the Unification Church lived and worked together, donating their earnings to their church.[7] The central issue for the jury to decide was whether the Tong I1 stock and Chase Manhattan Bank accounts belonged to the Church or to Moon personally. In probing that issue, it was inevitable that some Unification Church practices would creep into the trial in order to illustrate Moon's control over the activi-

ties of other church officials. The question before us is whether evidence of Church practices, although relevant, should have been excluded because "its probative value [was] substantially outweighed by the danger of unfair prejudice," Fed.R.Evid. 403. The trial judge from his superior vantage point is in the best position to weigh these competing interests. *See United States v. Robinson,* 560 F.2d 507, 514 (2d Cir.1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). Absent an abuse of his broad discretion, the decision of the trial judge to admit the challenged evidence of religious practices must stand. To find such abuse, we must conclude that the trial judge acted arbitrarily or irrationally; to avoid acting arbitrarily a court must make a conscientious assessment when weighing probative value against the risk of unfair prejudice. *United States v. Birney,* 686 F.2d at 106. A thorough review of the record reveals no abuse of the district court's discretion.

### D. Post Trial Proceedings

After the trial was concluded claims surfaced of improper influences on the jury. These allegations arose when a Unification Church member, attorney David Hager, was contacted by a man named Bruce Romanoff who was apparently attempting to sell tape recordings of phone conversations between Romanoff's associate, John Curry, and former trial juror Virginia Steward, a personal friend of Curry. On these tapes Steward made various statements indicating that the jury might have been exposed to extraneous prejudicial information and improper outside influences. After conducting a hearing where Romanoff, Curry, Steward and two other potentially knowledgeable jurors, forelady Mary Nimmo and John McGrath, were questioned, the trial court concluded that no grounds existed to believe that the jury had been exposed to improper outside influences or extraneous

---

7. We note that the Unification Church members' mode of living, evidence of which appellants claim amounts to religious innuendo, is also prevalent in certain centuries-old orders of Christians and Buddhist monks.

prejudicial information and that there was no need to continue the inquiry.

It hardly bears repeating that courts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences. As we explained in *United States v. Moten,* 582 F.2d 654, 666–67 (2d Cir.1978), a trial court is required to hold a post-trial jury hearing only when reasonable grounds for investigation exist. Reasonable grounds are present when there is clear, strong, substantial and incontrovertible evidence, *King v. United States,* 576 F.2d 432, 438 (2d Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978), that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant. A hearing is not held to afford a convicted defendant the opportunity to "conduct a fishing expedition." *United States v. Moten,* 582 F.2d at 667. Although the circumstances in the decided cases are instructive, each situation in this area is *sui generis.* *United States v. Barnes,* 604 F.2d 121, 144 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).

This same standard, which applies to a trial judge's determination of whether to hold a post-verdict hearing, is also useful in ascertaining whether the scope of a hearing that has been held is adequate. While the breadth of questioning should be sufficient "to permit the entire picture to be explored," *United States v. Moten,* 582 F.2d at 667, that picture is painted on a canvass with finite boundaries. Therefore, in the course of a post-verdict inquiry on this subject, when and if it becomes apparent that the above-described reasonable grounds to suspect prejudicial jury impropriety do not exist, the inquiry should end.

Moon asserts that the district court improperly curtailed defense attempts to conduct a more thorough inquiry and that at the post-trial hearings three areas should have been explored further. First, he claims it was error to block defense efforts to find out whether the jurors discussed Moon's request not be tried by a jury. This fact was allegedly reported at the end of a newspaper article which concerned a *different* topic that had apparently been mentioned by Nimmo and discussed among the jurors. But all the jurors questioned stated that they had not read the article, and the two found to be credible by the court below noted that the main subject of the article was mentioned only casually and was passed-off lightly. None even indirectly intimated that Moon's request concerning a jury trial was known to them, let alone a topic of conversation before the jury at large. Moreover, Moon has not shown how he would be prejudiced even were the jurors aware of his desire to be tried without a jury.

Second, Moon claims that the trial court erred by refusing to call additional jurors to explore the issue of newspapers in the jury room. The fact that there were newspapers in the jury room is an insufficient predicate for conducting a post-verdict inquiry. The jurors were instructed not to read articles concerning the case before them; they were not absolutely precluded from looking at newspapers. All of those questioned indicated that they had not read articles about the case, did not know of any jurors who had, and had not heard other jurors discussing such articles (other than the one alluded to above). One said she did not look at the newspapers, another said she only played the "Wingo" game, and the third said he and others cut out articles about the case, but he was saving these to read after the trial. There has been no showing, let alone a substantial one, that any of the jurors read prejudicial newspaper accounts of the case. Moon's claim that some juror *might* have done so is a speculative argument insufficient to justify further inquiry.

Third, Moon argues that it was necessary to call juror Esperanza Torres to the stand and to explore the circumstances surrounding the firing of a shot through Torres's window during the trial. Steward testified that Torres had been upset one day

because a shot had been fired through her window the night before, and that Torres intimated to Steward that the incident might be connected to her jury service. Steward also related that Torres told her the police had investigated, found no bullet, and concluded that the hole in Torres's window was most likely caused by a BB shot by "just some fresh kids . . . fooling around." Steward apparently thought little of the incident since Torres lived in a bad neighborhood, and when Torres had been similarly upset after her car was hit from behind, Steward told her not to be silly and that it was just a coincidence. Nimmo confirmed having heard second-hand of the BB incident and that it was probably due to the nature of Torres's neighborhood, but she had not heard that Torres attributed it to the trial. McGrath, who sat next to Torres in the jury box, heard nothing about these events.

Given these facts it was unnecessary for the district court to probe any further into the event since, unlike the circumstances in *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), *appeal following remand,* 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956) and *United States v. Gersh,* 328 F.2d 460 (2d Cir.1964), there was no rational basis to connect these outside incidents with the trial. Moreover, even if Torres had been interrogated, she could only have been questioned about "whether any outside influence was improperly brought to bear upon" her, and could not have been asked about "the effect of [the incident] upon [her] mind or emotions as influencing [her] to assent to or dissent from the verdict," Fed.R.Evid. 606(b). The most she could have done was to repeat the story about the BB shot, but it would violate Rule 606(b) to have her juxtapose the incident with her jury service and have her testify that it influenced her vote. *See United States v. Beltempo,* 675 F.2d 472, 481 (2d Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2936, 73 L.Ed.2d 1353 (1982). Without calling Torres the court had sufficient information from which it could conclude that there was no outside influence improperly brought to bear upon her, and that any

supposed connection between the two events and the trial was not and could not be supported factually.

■ Of course, "[t]he safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible" and "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). It is up to the trial judge to determine the effect of potentially prejudicial occurrences, *id.,* and the reviewing court's concern is to determine only whether the trial judge abused his discretion when so deciding. Whether or not we, sitting in the trial judge's place, might have called Torres to testify is not the issue. We cannot say that Judge Goettel abused his discretion by ending the post-trial inquiry when he did.

■ At the conclusion of the post-verdict jury inquiry, the district judge also ordered, on pain of contempt,

that the defendants . . . and their agents, the defense attorneys and their agents, and the Government attorneys and their agents, are restrained from communicating with, or contacting in any manner whatsoever any juror, alternate juror, or . . . prospective juror in the [instant] case, without prior consent of the Court.

Defense counsel argue that this amounts to a gag order which violates the First Amendment because, when read in conjunction with the court's accompanying memorandum decision, it placed a prior restraint on all Unification Church members, forbidding them from communicating with the media on the subject of jury prejudice in Moon's case. Aside from the fact that the memorandum does not say this, such a reading of the clear, unambiguous language of the restraining order is far-fetched. While the accompanying memorandum sheds light on the court's reasons for imposing and power to impose the restraint against jury contact, it is gratuitous insofar as the content of the order itself is concerned. Moreover, we lack appellate jurisdiction to re-

view this order and mandamus is inappropriate where, as here, the district court's power to act as it did is unquestionable. *See Miller v. United States,* 403 F.2d 77 (2d Cir.1968) (no appellate jurisdiction, and virtually identical order condoned).

## V

### KAMIYAMA CLAIMS

#### A. Intent to Impede the Grand Jury Investigation

■ Kamiyama contends that his conviction for knowingly submitting false and misleading documents to the grand jury with intent corruptly to impede its investigation, in violation of 18 U.S.C. § 1503 (Supp. V 1981), must be set aside. Specifically, he asserts that he only submitted the documents in question (the Family Fund Ledger and European Loan Agreements) to the grand jury because it had subpoenaed them and that there was insufficient evidence that he intended to impede its investigation. In response to this challenge, the government answers that Kamiyama's corrupt intent was adequately demonstrated by the facts that he could have resisted production of the documents on Fifth Amendment grounds and that he vouched for the accuracy of the documents in his testimony before the grand jury. Specific intent to impede the administration of justice is an essential element of a § 1503 violation, *United States v. Ryan,* 455 F.2d 728, 734 (9th Cir.1972) (citing *Pettibone v. United States,* 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419 (1893)), which the government must establish beyond a reasonable doubt. Viewing the evidence in the light most favorable to the prosecution, we are unpersuaded that Kamiyama's corrupt intent was adequately proved.

■ In examining the evidence underlying this Count, we may look only to that evidence actually introduced before the petit jury. There would be no problem with the government's contention had it introduced proof before the petit jury to the effect that Kamiyama had not only produced the questionable documents, but had also

affirmatively vouched for their accuracy. Similarly, the government's case would be more persuasive were there any evidence that Kamiyama had submitted the documents with the knowledge that, had he chosen, he could have resisted production on the grounds of self-incrimination. On both of these points the government fails to direct us to any portion of the trial record in which such evidence was brought to the petit jury's attention. Nor have we, after reviewing the actual trial transcript, found any such evidence.

■ What remains to be answered is whether the petit jury could still properly infer corrupt intent from the fact that Kamiyama submitted the false documents to the grand jury knowing that the documents were material to that jury's investigation. Intent to obstruct justice is normally something that a jury may infer from all of the surrounding facts and circumstances. *See United States v. Haldeman,* 559 F.2d 31, 115–16 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *cf. United States v. Dibrizzi,* 393 F.2d 642, 644 (2d Cir.1968) (dealing with intent to embezzle). Were it not for the fact that the documents were subpoenaed, such an inference would doubtless have been permissible in this case. But here the ledger and loan agreements were produced pursuant to subpoena and even though there was ample proof of their being falsely backdated, there was no evidence of Kamiyama's corrupt intent in producing them. Whether or not Kamiyama could have resisted production, as the government argues, evidence of this government theory was not before the trial jury. Without it, a reasonable doubt as to Kamiyama's *mens rea* exists. Therefore, his Count Seven conviction must be reversed.

#### B. False Declarations Before the Grand Jury

Kamiyama also attacks his convictions under Counts Eleven, Twelve and Thirteen of the main indictment and the only count of the additional indictment (No. 194). As earlier noted, those counts charged Kamiya-

ma with making false declarations to a grand jury, in violation of 18 U.S.C. § 1623 (Supp. V 1981). That statute provides in pertinent part that "[w]hoever under oath . . . in any proceeding before or ancillary to any . . . grand jury of the United States knowingly makes any false material declaration" shall be guilty of a crime. 18 U.S.C. § 1623(a). Before addressing the precise issues raised some background information is necessary.

In March 1981 Kamiyama appeared before the June 1980 Additional Grand Jury for the Southern District of New York (Grand Jury) but refused, on Fifth Amendment grounds, to testify. In July 1981 Kamiyama changed his mind and testified before both the Grand Jury and a substitute grand jury which was filling in for the Grand Jury while its members were on vacation. Counts Eleven, Twelve, Thirteen and No. 194 involve statements initially made and recorded before this substitute grand jury and later presented to the Grand Jury in accordance with the latter's instructions.

Prior to trial appellant moved to dismiss the perjury counts arising from his testimony before the substitute grand jury on the ground that this testimony was not material to any investigation being conducted by the substitute grand jury. In a published decision, the district court agreed that Kamiyama's statements to the substitute grand jury technically were not material to any investigation then being conducted by it. *United States v. Moon,* 532 F.Supp. 1360, 1371 (S.D.N.Y.1982). Nevertheless, the district court refused to dismiss the subject counts, reasoning that § 1623(a) extends to proceedings ancillary to those of a grand jury and that at the time Kamiyama testified before the substitute body it was acting in such an ancillary capacity. *Id.* On that basis the trial judge found that Kamiyama's substitute grand jury testimony was material to an investigation being conducted by the Grand Jury. The petit jury thereafter impliedly found by its conviction of defendant on Counts Eleven through Thirteen and No. 194 that Kamiya-

ma gave the testimony knowing it to be false.

Kamiyama now challenges the district court's materiality finding. He argues that the substitute grand jury could not, as a matter of law, constitute an ancillary proceeding; that there was no evidence that the substitute grand jury was ancillary; that the district court erred in ruling on the ancillary proceeding question rather than submitting it to the petit jury; and that the district court impermissibly amended the indictment by relying on the ancillary proceeding theory which was not set out in the indictment. Moreover, he contends that there was insufficient evidence that his misstatements were material to the Grand Jury which eventually heard them. For the reasons discussed below these arguments are of no avail.

■ Section 1623 proscribes false declarations made before a grand jury where those declarations are "material," i.e., made in response to questions within the purview of matters that the grand jury is investigating. *United States v. Berardi,* 629 F.2d 723, 727 (2d Cir.), *cert. denied,* 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980); *see United States v. Mulligan,* 573 F.2d 775, 779 (2d Cir.), *cert. denied,* 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978). Whether or not a false declaration is material to a grand jury investigation is a question of law that must be determined by the court, not the jury. *Sinclair v. United States,* 279 U.S. 263, 298–99, 49 S.Ct. 268, 273, 274, 73 L.Ed. 692 (1929) (dicta); *Berardi,* 629 F.2d at 728; *Mulligan,* 573 F.2d at 779. Materiality is demonstrated if the question posed is such that a truthful response could potentially aid the inquiry or a false answer hinder it. *Berardi,* 629 F.2d at 728. Because materiality is a question of law, an appellate court may substitute its judgment for that of the lower court on the issue of whether the materiality element has been met. *See Berardi,* 629 F.2d at 728–29 (holding that the district court erred in finding false declaration immaterial).

■ Because we disagree with the district court's holding that Kamiyama's state-

ments "technically" were not material when made to the substitute grand jury, we need not reach or decide the numerous questions regarding whether the substitute grand jury was conducting an ancillary proceeding. The district court's finding that Kamiyama's statements were immaterial to the substitute grand jury is at odds with the only evidence in the record on this point. There is uncontradicted, direct testimony in the record by Assistant United States Attorney Martin Flumenbaum that both the Grand Jury and the substitute grand jury were investigating Moon for possible tax violations. For example, Flumenbaum testified that the substitute grand jury was "charged with investigating the same matters that [the Grand Jury] was doing." This testimony was supported by affidavit evidence to the effect that: the Grand Jury approved in advance the procedure by which Kamiyama testified before the substitute grand jury, which was advised as to the substance of the on-going investigation of Moon and informed of the context in which Kamiyama was testifying; on two occasions the substitute grand jury heard testimony from another witness in this case; and the substitute grand jury actively participated in the proceedings by asking numerous questions relating to the handling of Moon's tax and business affairs and by requesting the production of documentary evidence. If the substitute grand jury cannot be said to have been investigating Moon's tax affairs when it was asking Kamiyama about those affairs, it is difficult to perceive exactly what it was doing.

▮ Since both grand juries were investigating Moon's tax affairs, it seems somewhat illogical to say that Kamiyama's answers were immaterial when given to the substitute grand jury, but material, as the district court found they were, when repeated verbatim to the indicting Grand Jury. Our examination of the questions and responses in issue further strengthens our conviction that they were material to both grand juries' inquiries. The questions and answers set forth in Counts Eleven, Twelve, Thirteen and No. 194 do not deal simply with tangential matters of no relevance to the instant prosecution. Instead, they are concerned with the sources of Moon's Chase accounts funds, the Family Fund Ledger, the acquisition of the Tong Il stock, and the manner in which Moon conducted his business affairs. These matters were at the very heart of both grand juries' inquiries and related to the critical issues at trial. As a matter of common sense, we do not believe there is any basis to label them immaterial.[8]

### C. Claimed Translation Inaccuracies

Kamiyama further contends with respect to his perjury convictions that he was impermissibly indicted and convicted for statements he did not give. Because his principal language was Japanese, he addressed the grand juries through an interpreter. At the request of counsel tape recordings were made of Kamiyama's grand jury statements. After being indicted for perjury in October 1981, Kamiyama received copies of the tape recordings of his testimony. After they were reviewed by defense counsel Kamiyama moved to dismiss certain specifications contained in Counts Ten through Thirteen on the ground that the allegedly perjurious language did not accurately reflect what he had actually said to the grand jury. He also requested that a court-appointed translator review the accuracy of the challenged language. Before the trial court ruled on Kamiyama's motion, a superseding indictment was returned

---

8. Our decision on the materiality issue does not intrude on appellant's double jeopardy rights under the Fifth Amendment since it neither necessitates a retrial nor has the effect of setting aside a judgment of acquittal on the merits. *See Berardi,* 629 F.2d at 730; *cf. Whalen v. United States,* 445 U.S. 684, 688, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980) (double jeopardy protects against a second trial for the same offense); *United States v. Scott,* 437 U.S. 82, 91, 98 S.Ct. 2187, 2194, 57 L.Ed.2d 65 (1978) (judgment of acquittal may not be appealed and terminates prosecution when reversal would necessitate new trial). We have merely adopted another basis for affirming the district court's conclusion that Kamiyama's substitute grand jury statements were material.

which omitted two of the allegedly inaccurate specifications in Count Ten.

The trial court ultimately appointed an interpreter to translate the tape recording of those portions of Kamiyama's grand jury testimony included in the indictment. Judge Goettel also requested defense counsel to "specify the particular portions of the translation that [were] in dispute." This was done at a pretrial hearing held on March 5, 1982. With respect to the objections to Counts Ten and Eleven, the district court found no significant difference between Kamiyama's testimony as set out in the superseding indictment and the court-appointed translator's interpretation of the recordings of that testimony. It did agree with Kamiyama's claims that certain Count Twelve testimony had been translated inaccurately and it dismissed all of that Count's specifications objected to by Kamiyama. With regard to Count Thirteen, the court found that the appointed translator's version of what Kamiyama had said agreed with the language quoted in the indictment, and counsel for Kamiyama accepted those translations as being accurate. The government later obtained a superseding Count Twelve indictment which omitted the previously objected to language.

At trial Kamiyama did not argue that the translation of the testimony set forth in the remaining false declaration counts was inaccurate. After the close of the evidence, the district court granted Kamiyama's request to make the court translator's translation an exhibit which the jury could see, if requested. Although the jury was so informed, apparently it did not request the exhibit.

On appeal Kamiyama now asserts that "all specifications" in the perjury counts were erroneously translated and fatally ambiguous.[9] Close examination of appellant's contentions reveals that some of the points raised actually relate to sufficiency of the

evidence as to falsity, not to accuracy of translation. In any event we address appellant's "translations" contentions one count at a time.

With respect to Count Nine, appellant asserts that while he was indicted for answering in the negative the question "did" Reverend Moon sign any documents dealing with stock, the question actually posed was whether Reverend Moon ever "had" to sign such documents. This claim of inaccurate translation was not raised in defendant's pretrial motion to dismiss; nor did he attempt to bring the purported infirmity to the attention of the court or jury at trial. Consequently, the objection to Count Nine has not been preserved for appeal. *See United States v. Bonacorsa*, 528 F.2d 1218, 1222 (2d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976).

The testimony underlying Count Ten, as set out in the indictment, is as follows:

[False declarations or answers are underlined.]

"Q. Did Reverend Moon carry the check book with him?

A. *He doesn't, because I managed it.*

Q. You carried the check book with you from the very beginning of the account?

A. *Yes, I kept it myself from the beginning.*

Q. Did you sign any of the checks for Reverend Moon's account?

A. I never signed it myself, although I asked him for signature, and I made a request, but I never signed myself.

Q. Reverend Moon signed all the checks?

A. That's correct.

Q. And did Reverend Moon write out the other portions of the check other than his signature?

A. *No, no, he didn't do it.*

---

**9.** Citing *United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir.1972), Kamiyama also contends that the prosecution abused the grand jury process by not having it reevaluate all of the perjury counts in light of the court-appointed translator's findings. This claim is meritless;

even Kamiyama concedes that the translator's findings generally accorded with the allegedly perjurious language set forth in the indictment. Where there were material variances, for example in Count Twelve, the government did resubmit its case to the grand jury.

Q. You prepared all the checks for him?

A. *That's correct.*

\* \* \* \* \* \*

Q. Did Reverend Moon ever write any portion of the checks on the Chase Manhattan account other his signature?

A. *He never wrote anything other than his own signature as far as I remember.*

\* \* \* \* \* \*

Q. So, to your knowledge, he never wrote anything but the signature; is that correct?

A. *To the best of my knowledge, Reverend never affixed anything other than the signature in the book, in the check.*

■ With respect to the first two allegedly false answers, Kamiyama's objection goes not to the accuracy of the translation, but to the sufficiency of the government's proof at trial. He claims that his answers stated only that Moon does not presently carry the Chase account checkbook; that while the government proved at trial that Moon previously carried the checkbook, it did not prove that he presently does so; and that, therefore, Kamiyama's answers were not shown to be literally false at trial. We disagree. Viewing the first two answers in sequence and in context, *see Bonacorsa,* 528 F.2d at 1221, they plainly state that Moon "did" not carry the checkbook. This assertion was indisputably proved not to be true at the trial. Kamiyama's remaining contentions regarding Count Ten were either waived or are wholly without merit.

Moving to Count Eleven, the specifications of perjury were as follows:

[False declarations or answers are underlined.]

Q. Now, what was the largest deposit, single deposit that was made into Reverend Moon's account?

A. I think it was around four hundred thousand dollars.

Q. Who deposited that money?

A. I don't remember who I asked to do so. One thing is for sure, I didn't do it myself.

Q. And where did you get the money, that four hundred thousand dollars, to deposit in Reverend Moon's account?

A. *From family fund.*

Q. And where was the money actually at the time before you deposited it into Moon's account?

A. I wasn't physically in charge for that fund. But, I may have asked Miss Tomoko Torii, T-o-m-o-k-o T-o-r-i-i, but without clear recollection.

Q. Well, where did the four hundred thousand dollars—how did you get the four hundred thousand dollars that you deposited into Moon's account?

A. *Over the years, our brethren from Japan, who came to USA, they contribute, and it was accumulated.* I remember that there are at least about seven hundred brethren coming to the USA.

Q. Was any of the money in the family fund ever used to pay expenses for the Japanese members who had come to New York?

A. No. We never did that.

Q. So why didn't you put this money in a bank account?

A. Part of which was put into the bank, and the balance was kept.

Q. Well, did you have a bank account in the name of the family fund?

A. No.

Q. Why did you use Reverend Moon's name for the family fund?

A. *As the money came from overseas,* and part of that money may become necessary as expenses to take care of the brethren, we put it in Reverend Moon's name, who legitimately represents International Unification Church.

■ Kamiyama argues that the first two answers, although not alleged to be false, were inaccurately translated and somehow cast the third answer in a misleading context. Even assuming inaccuracies with respect to the interpretation of the first two answers, we fail to see any

relationship between them and the third answer, the one alleged to be false. With respect to the second allegedly false answer, Kamiyama's claim that it was inaccurately translated is unpersuasive since the version set out in the indictment is in substantial agreement with the appointed translator's version. Kamiyama also argues that the third allegedly false answer—"As the money came from overseas"—resulted from an inaccurate translation by the interpreter. Comparing this language used in the indictment with the version of the court-appointed translator—"the money from overseas"—we see no material difference.

As for Count Twelve, none of the alleged mistranslations, ambiguities, or other purported infirmities complained of now was raised below. Thus, these claims are waived. Similarly, while he now asserts that the two questions underlying Count Thirteen were translated in a fatally "vague and ambiguous fashion," appellant abandoned his Count Thirteen translation objections during the pretrial hearing on his motion to dismiss. Moreover, there is nothing unduly vague or ambiguous about the Count Thirteen colloquy, which reads as follows in the indictment:

"Q. Did you ever tell Michael Warder [a lower echelon Unification Church official] to tell government investigators that he got $5000 to purchase stock in Tong Il from relatives or friends? Did you ever tell him to give that explanation to anyone?

A. *I didn't do it.*

Q. Did you ever tell Mike Warder to give a false explanation as to how he paid for his stock in Tong Il?

A. *No, I didn't.*

Appellant further argues with respect to Count Thirteen that the government failed to prove the falsity of his answers. Specifically, he contends that the government demonstrated at trial only that he "suggested" or "recommended" that Warder give a false explanation as to the Tong Il stock's origin, which is not the same as "telling," and, therefore, that his answers to the grand jury questions were not proven false. Viewing the evidence in the light most favorable to the government, the jury could have concluded that when Kamiyama recommended to Warder that he do something he was telling him to do it. Appellant makes no specific claims with respect to the translation of colloquy underlying count No. 194. Nor does he argue that the government's evidence on that count was insufficient.[10]

Accordingly, the judgments of conviction are affirmed on all counts except Count Seven, on which Kamiyama's conviction is reversed. The mandate of the court shall issue forthwith, provided that the mandate shall be stayed for the purpose of and for so long as is permissible to perfect and determine timely appeals from this decision.

OAKES, Circuit Judge (dissenting):

While fully concurring in the other portions of Judge Cardamone's lucid and careful opinion, I am required to dissent to that portion of it relating to the trial judge's charge on the law of trusts. Majority op. IIIA. Contrary to the Government's brief and the majority's view that "Moon did not raise until late in the trial" the claim that he was holding the assets in question in trust, this was his position in the pretrial motion to dismiss as well as during argument on the midtrial motion for a judgment of acquittal. The trial judge quite properly acknowledged his obligation to charge on the law of trusts and did so no fewer than three times in the space of six pages of transcript.[1] The Government's assertion

---

10. Kamiyama's final contentions regarding his perjury convictions are: (1) that the government breached some obligation on its part to insure at the grand jury level that Kamiyama's erroneous answers were in fact intentional lies rather than mere negligent mistakes; and (2) that his false answers underlying Counts Nine and Ten were immaterial because the grand jury already had in its possession information contradicting his testimony. The district court rejected these arguments in its published decision see 532 F.Supp. at 1371–72, 1374, and we agree with that rejection for the reasons stated in the district court's opinion.

1. For example:

that defendants made "no claim ... that [they] wanted, much less were entitled to, any of the specific instructions on the law of trusts which are claimed to be so crucial on appeal" simply does not hold water. The Reverend Moon submitted detailed instructions with supporting memoranda of law both on the general issue of beneficial ownership (No. 16) and on the specific issue whether an unincorporated religious association can be the beneficiary of a charitable trust (No. 15). Similarly, counsel pressed and elaborated upon his requests at the charging conference and made plain his disagreement with the proposed instruction submitted by the Government. Furthermore, counsel lodged specific objections to the instructions as given and in doing so specifically renewed the request for proposed instructions. The defense position was clear and consistent throughout the proceedings. *See United States v. Kelinson,* 205 F.2d 600, 601–02 (2d Cir.1953) (Fed. R.Crim.P. 30 "does not require a lawyer to become a chattering magpie").

Even if objections were not properly preserved, however, the issue of beneficial ownership was one "central to the determination of guilt or innocence" in the case, *United States v. Alston,* 551 F.2d 315, 321 (D.C.Cir.1976). Thus, any defects in respect to the charge on this central issue would constitute plain error and require reversal. *See Connecticut v. Johnson,* —— U.S. ——, ——, 103 S.Ct. 969, 976, 74 L.Ed.2d 823 (1983).

Before discussing in detail what I believe were the errors in the trust instructions, I wish to put them in context because it is only then that their importance becomes apparent. In the first place, whether the Chase Manhattan Fund and the Tong Il stock held in Moon's own name were church property or Moon's personal property was the critical issue in the case. The Government went to great lengths to establish a fact that was really conceded from the beginning, that the assets were held in Moon's own name. But the law is clear that dominion and control over funds does not by itself establish taxability, at least where funds are beneficially owned by another. *See, e.g., Brittingham v. Commissioner,* 57 T.C. 91 (1971); *Seven-Up Co. v. Commissioner,* 14 T.C. 965 (1950). *See also Poonian v. United States,* 294 F.2d 74 (9th Cir.1961). Thus, it was essential that the court's instructions precisely state the law on the creation of a trust relationship and the implications of the jury's finding that such a relationship existed in this case.

In the second place, this case did *not* involve a claim that an ordinary, lay taxpayer held certain assets in a private trust for the benefit of another. On the contrary, the taxpayer here was the founder and leader of a worldwide movement which, regardless of what the observer may think of its views or even its motives, is nevertheless on its face a religious one, the members of which regard the taxpayer as the embodiment of their faith. Because Moon was the spiritual leader of the church, the issue whether he or the church beneficially owned funds in his name was not as crystal-clear as might seem at first glance to be the case.

It appears that the assets in question came to Moon largely from members of his faith, and there was some evidence that the donors intended their contributions to be used by him for religious purposes. The religious context involved gives the case a special color. As noted in cases such as *Winn v. Commissioner,* 595 F.2d 1060, 1065 (5th Cir.1979), funds donated for the use of an individual involved in religious work may be considered gifts to the religious organization with which the individual is affiliated. In *Winn,* for example, it was held that where money was given to the taxpayer's cousin, a missionary, in response

But I do think you have got to get before the jury the notion that if the jury believes that the people who gave the money intended it to be for the International Unification Church Movement, and if Moon believed he was holding it for that purpose, and if he believed he was using them for that purpose, even though he may have in a few instances made bad investments or used some of it for himself, that the monies could still be viewed as not being his but being the Movement's. T. 6122.

to a church-sponsored solicitation, for deposit ultimately to her personal account, and was used, as intended, to support her mission work, it was sufficiently established that the funds were donated "for the use of" the church(es) to permit the contributing taxpayers to claim deductions for contributions. Similarly in *Morey v. Riddell,* 205 F.Supp. 918, 921 (S.D.Cal.1962), it was held that where money contributed to a totally unorganized religious association by way of checks to individual "ministers" was used to meet expenses of the church, including the ministers' living expenses, deductions for religious contributions would be permitted. *But see Cox v. Commissioner,* 297 F.2d 36 (2d Cir.1961) (not deductible when intent was to make bequest to individual). The Reverend Moon's claim that he held the Chase Funds and the Tong Il stock as trustee for the Unification Church movement likewise raised the question whether the donors intended this property to be used for religious purposes. In this context, then, I think it was incumbent upon the court to make certain that the trust charge not only properly state the factual elements that were involved, but that it also clearly emphasize that the Government had the burden of proof beyond a reasonable doubt on this difficult issue.

Moreover, as we are referred to state law in respect to ownership, *see United States v. Mitchell,* 403 U.S. 190, 197, 91 S.Ct. 1763, 1768, 29 L.Ed.2d 406 (1971); *United States v. Manny,* 645 F.2d 163, 166 (2d Cir.1981); *see also* Treas.Reg. § 301.7701–4 (1974), the instructions must be viewed in light of New York law pertaining to assets given to a religious leader for use by the trust. While I by no means agree with the appellants' contention that New York law establishes a presumption that any assets given to a religious leader are held by him in a charitable trust, it at least permits of a finding to this effect.

This conclusion stems from the following facts. First, the law favors charitable trusts and will draw reasonable inferences and resolve ambiguities to find and uphold them. *In re Price's Will,* 264 A.D. 29, 35 N.Y.S.2d 111, 114–15, *aff'd,* 289 N.Y. 751, 46 N.E.2d 354 (1942); *In re Estate of Nurse,* 35 N.Y.2d 381, 389, 362 N.Y.S.2d 441, 446, 321 N.E.2d 537 (1974). *See* N.Y.Est. Powers & Trusts Law § 8–1.1 (McKinney 1967). Second, when a gift appears to have been made for charitable or religious purposes, the gift may be found to have been made in trust even if no trust language has been used and even if the gift was in form absolute. *In re Durbrow's Estate,* 245 N.Y. 469, 477, 157 N.E. 747, 749 (1927); *see also New York City Mission Society v. Board of Pensions,* 261 A.D. 823, 823, 24 N.Y.S.2d 395, 396 (1941). Third, there are numerous cases holding that a minister or other church official who held title to property in his own name did so as trustee for the church. *See, e.g., Sears v. Parker,* 193 Mass. 551, 79 N.E. 772 (1907) (fund for widows and orphans of church ministers); *Jones v. Habersham,* 107 U.S. 174, 182, 2 S.Ct. 336, 343, 27 L.Ed. 401 (1882) (devise to church trustees to benefit of poor and feeble churches in state). *See* 4 A. Scott, *The Law of Trusts* §§ 371.3, at 2885 & n. 4, 351 at 2797–98 (3d ed. 1967). Finally, where the source of the assets is a church source, added to the fact that the donee is a religious official, a trust may be imposed. *See Fink v. Umscheid,* 40 Kan. 271, 19 P. 623 (1888) (Catholic bishop using money supplied by congregation to purchase land in his own name for a church and school, later attempting to sell property; land concededly held in trust). *See also Archbishop v. Shipman,* 79 Cal. 288, 21 P. 830 (1889). Thus the key issue was whether the funds were given to Moon for his own use or for that of his international church movement, and whether, even though some of the funds were utilized for his own living purposes, the donors intended to permit such use.[2]

---

2. I note here that Moon was indicted, and the case was tried, on the theory that the funds were never in trust to begin with, and not on the theory that he had "diverted" to his own use funds originally given in trust.

I reprint in the margin [3] the instructions on the "key issue" or the "central question" as the judge in his instructions to the jury termed it. The ensuing discussion relates

3. The key issue is whether or not the bank accounts at the Chase Manhattan Bank and the Tong Il stock issued in Reverend Moon's name belonged to Reverend Moon.

The defense contends that these funds and stock were beneficially owned by the International Unification Church Movement which supported the activities of the various national church entities in the United States and elsewhere.

The government contends that these funds belong to Reverend Moon.

This is the crucial issue of fact for you to decide.

If you find that the funds in the Chase accounts were the property of International Unification Church Movement or were held in trust by Moon for the International Unification Church Movement and used for church purposes and that the interest on those funds also belonged to the International Unification Church Movement and were used for it, then that interest would not be taxable income to Moon. You should not consider whether that interest income would be taxable to anyone other than Moon; that is, you should not concern yourself with whether the International Unification Church Movement had any tax liability for the interest earned by the time deposits, because that is not an issue in this case.

In determining whether in 1973, 1974 and 1975 the International Unification Church Movement existed and whether the Movement owned the funds in the Chase accounts and Tong Il stock or whether Reverend Moon owned them, you should consider all the evidence, including such factors whether the Movement had a specific organizational structure, written charter or constitution, the existence of other Unification Church corporate entities during the relevant time period, the fact that the accounts were maintained under Reverend Moon's name, the source of the funds, the intent of the parties who caused the stock and funds to be transferred to Reverend Moon's name, evidence of any agreements as to how the funds would be used, the manner in which the stock and funds were administered and whether there is any evidence Moon ever accounted to anyone for the use of the funds.

This list is by no means exhausted. You should consider all the evidence in making your determination.

In consider[ing] the evidence, there are a number of related issues which may occur to you. I want to briefly instruct you on the law applicable to these issues.

As I have mentioned, you may consider whether the International Unification Church Movement had a specific organizational structure in making your decision. However, the lack of a formal corporation does not prevent a religious movement from being the beneficial owner of property held in the name of another.

Now, the defendants contend, among other things, that Moon held the Tong Il stock and the funds of the Chase accounts as trustee for the International Unification Church Movement. Let me briefly explain to you the essentials of a trust in order for you to evaluate these contentions.

A trust is created when a person is given money or property to be held and used for the benefit of someone else. The person holding the property is called the trustee.

The person who transfers the property to the trust is referred to as a "settler"; the person who holds the property is the "trustee"; and the person or entity on whose behalf it is held is the "beneficiary."

Whether a trust is created depends on the intent of the person giving the property at the time of the transfer, and that intent must be clear and unambiguous. A trust can be created orally or by the conduct of the parties. The trust need not be reflected in a written document.

In order for a trust to exist, the trustee must be obligated to use the property for the benefit of the beneficiaries; a gift with a mere request or expectation that the property would be used a particular way does not create a trust. There is no trust if the person who receives the money is free to use it for his own benefit. If a trust does exist and the trustee diverts trust property to his own use, the funds diverted become taxable to him at the time and to the extent so diverted.

In determining whether a trust relationship existed, you should, as I have already mentioned, consider all the evidence before you.

It is unnecessary for there to be a written agreement between Reverend Moon and the International Unification Church, providing he held the time deposits and the Tong Il stock on behalf of the church. All that is required is that both parties to the relationship understand that the first person is holding the property for the benefit of the second, and you can find such an understanding on the basis of the party's conduct.

Also the mere fact that Reverend Moon exercised control over the funds and the stock is not necessarily indicative of his personal ownership. A person who holds property on behalf of another may be given broad authority and discretion to deal with that property as long as he does so in a manner consistent with the purpose for which he was given title to the property in the first place.

I would like to say a few final words on the subject of religious movements.

Such organizations can invest and conduct businesses. While the income from such businesses is taxable, this fact does not make

to this material. In my view those instructions contained errors which, because they were on the crucial issue of the case, must be considered prejudicial.

First, in referring to the fact that the jury should consider all the evidence on the issue whether the Unification Church movement existed and whether the movement or the Reverend Moon owned the funds in the Chase accounts and Tong Il stock, the court listed eight factors as set forth in Paragraph Six of the footnote. Listed among these, but not emphasized, was "the intent of the parties who caused the stock and funds to be transferred to Reverend Moon's name." Rather than simply including intent as one of the things for the jury to consider, the court in my view should have advised the jury to accord the greatest weight to this factor. The church source of the funds and Moon's role as church leader were likely to cast light on the issue of the donors' intent, and accordingly the charge should have specifically directed the jury's attention to them. The instruction as given allowed the jury to find against Moon on the issue of beneficial ownership without even considering the crucial issue of donors' intent. *See Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

Secondly, though the issue was whether funds were given to a religious trust, the charge was that the intent to create it must be "clear and unambiguous," as in the case of private trusts. I recognize that the majority believes this portion of the charge to be correct under New York law, but the cases it cites for that proposition do not support it. *County of Suffolk v. Greater New York Councils, Boy Scouts of America,* 51 N.Y.2d 830, 832–33, 433 N.Y.S.2d 424, 425, 413 N.E.2d 363, 364 (1980), dealt only with the issue when a donation to a charitable organization, concededly subject to charitable trust restrictions, will be subject to additional specialized restrictions on use narrower than the organization's general charitable purpose; the court reversed a holding that a bequest to the Queens County Council of the Boy Scouts had to be used forever for a particular Boy Scout camp as distinct from the Boy Scouts generally. *Lefkowitz v. Cornell University,* 35 A.D.2d 166, 173, 316 N.Y.S.2d 264, 271 (1970), aff'd, 28 N.Y.2d 876, 322 N.Y.S.2d 717, 271 N.E.2d 552 (1971), held that a trust was not created by the donee's actions. Relying upon *In re Fontanella,* 33 A.D.2d 29, 30, 304 N.Y.S.2d 829, 831 (1969), the court held that the evidence was insufficient to show that the donee ever intended to create a trust. *Fontanella* simply involved a private trust, not a religious trust, and the donee was not the leader of a religious group.[4]

taxable the religion's income from other sources, including interest it earns on funds it has on deposit.

There is no legal requirement that a religious society be incorporated prior to making business investments. It is legal for an unincorporated church or religious association to be the beneficial owner of property held for its use in the name of others.

A religious organization can properly pay the living expenses of [its] leaders or ministers in order to allow them to pursue its religious purposes and can make loans to its ministers or leaders on arm's length terms. T. 6583–88.

4. The majority is equivocal in saying, on the one hand, that the only burden on Moon was to present a prima facie case that he held the assets in trust, and not to establish this as an affirmative defense and, on the other, that a review of the evidence reveals no proof that Moon actually held the subject funds in trust.

The majority states that "the only evidence presented was the testimony of three church members who simply stated that they gave money to Moon intending to donate it to their church. Nothing was said about creation of a trust." This statement runs contrary to the New York and other trust law I have cited above. It was not necessary that the creation of a trust be mentioned. *See* N.Y.Est. Powers & Trusts Law § 8–1.1 (McKinney 1967); Restatement (Second) of Trusts § 351 comment b (1959) ("No particular form of words or conduct is necessary for the manifestation of intention to create a charitable trust. Compare, as to private trusts, § 24(2). A charitable trust may be created although the settlor does not use the word 'trust' or 'trustee.'").

In this connection the trial court and I agree. There was evidence sufficient, though by no means conclusive, to present the question to the jury. The majority and I agree that, if this were the case, the burden of proof beyond a

Thus, there appears to be no good basis for finding that "clear and unambiguous" intent is necessary to create a charitable trust under the law of New York. The strong policy of New York trust law and of trust law generally is to uphold charitable trusts whenever possible and to construe their terms liberally. *See, e.g., In re Price's Will,* 264 A.D. at 29, 35 N.Y.S.2d at 111; *In re Durbrow's Estate,* 245 N.Y. at 469, 157 N.E. at 747. In light of this fact, it is anomalous to require "clear and unambiguous" proof of the donor's intent to establish a charitable trust.

The second crucial error in the instructions lies in the charge that the jury should consider as the very first factor whether the International Unification Church movement "had a specific organizational structure, written charter or constitution . . . ." (*See supra* note 3, ¶ 3.) The Government concedes that it is a cardinal rule of trust law that a charitable trust cannot fail for lack of a specific beneficiary. The court should have said that a specific organizational structure was *not* a prerequisite to the existence of a charitable trust because in fact no beneficiary of a charitable trust need be designated at all. *See* N.Y.Est. Powers & Trust Law § 8–1.1 (McKinney 1967).[5] *See* 4 A. Scott, *The Law of Trusts* § 364, at 2838–39 (3d ed. 1967).

Moreover, the court's instructions regarding the use or misuse of trust funds were at the very least confusing. (*See supra* note 3, ¶ 14.) First, while it may be correct as a matter of law that a trustee who diverts trust property to his own use is taxable to the extent of the diversion, diversion was not charged in the indictment. Thus, evidence of diversion was irrelevant to the

case. The diversion instruction, given over defense objection, was at variance with the theory on which the Reverend Moon was indicted and on which the entire case was tried.

Second, a trust may exist even though the trustee is endowed with the freedom to use for his own personal benefit a portion of the funds he holds in trust and such use will not nullify the existence of the trust. *United States v. Scott,* 660 F.2d 1145, 1166 n. 38 (7th Cir.1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982); Rev.Rul. 71–449, 1971–2 C.B. 77. This is particularly true in the case of monies held in trust by religious leaders, since often use of such funds to pay a leader's living expenses are within the scope of the church's religious purposes. *See, e.g., Morey v. Riddell,* 205 F.Supp. at 918. Moreover, the instruction failed to explain that, even if the Reverend Moon had improperly diverted some of the Chase funds to a nontrust use, such partial diversion could not make the entire corpus, and thus the interest thereon, taxable to him. *United States v. Scott,* 660 F.2d at 1145; *see also Herbert v. Commissioner,* 377 F.2d 65 (9th Cir.1967). The inclusion of the phrase "to the extent so diverted" in the diversion portion of the charge could not have conveyed this concept at all.

Finally, in my view the instructions shifted to the defendant the burden of proof on the issue of beneficial ownership. The jury was charged that "if" it found the Chase funds were the property of the International Unification Church movement or were held in trust by Moon for the movement, "then" the interest "would not be taxable income to Moon." The implication of this

---

reasonable doubt remained upon the Government. But the majority thinks there was not enough evidence to present the issue to the jury at all.

**5.** N.Y.Est. Powers & Trusts Law § 8–1.1(a) (McKinney 1967) reads as follows:

No disposition of property for religious, charitable, educational or benevolent purposes, otherwise valid under the laws of this

state, is invalid by reason of the indefiniteness or uncertainty of the persons designated as beneficiaries. If a trustee is named in the disposing instrument, legal title to the property transferred for such a purpose vests in such trustee; if no person is named as trustee, title vests in the court having jurisdiction over the trust.

instruction was that Moon had to convince the jury that the property belonged to the movement. *See Notaro v. United States,* 363 F.2d 169, 175–76 (9th Cir.1966) (condemning an "if/then" instruction as obscuring the locus of the burden of proof). By saying that the donor's intent must be "clear and unambiguous," not only was the law of charitable trusts being misstated, but the burden of proof improperly placed upon the defendant was made heavy indeed. I do not believe that the mention of "beyond a reasonable doubt" at the tail end of this discussion overcame the improper language within the curative concept of *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

Thus in a case where the crucial issue, and indeed the only real factual question, was whether property unquestionably held in Moon's own name was beneficially owned by him personally or was held by him on behalf of his international church movement, the charge fell short in several respects.

While often a charge is simply a way to achieve rough justice with the help of a jury, when a critical issue separating criminal conduct from civil is involved, in my view it must be accurate in *all* respects. This charge, I believe, was not.